1  MORGAN, LEWIS & BOCKIUS LLP
   Eric Meckley, Bar No. 168181
2  eric.meckley@morganlewis.com
   Brian D. Berry, Bar No. 229893
3  brian.berry@morganlewis.com
   Kassia Stephenson, Bar No. 336175
4  kassia.stephenson@morganlewis.com
   One Market, Spear Street Tower
5  San Francisco, CA  94105-1596
   Tel:    +1.415.442.1000
6  Fax:    +1.415.442.1001

7  MORGAN, LEWIS & BOCKIUS LLP
   Ashlee N. Cherry, Bar No. 312731
8  ashlee.cherry@morganlewis.com
   1400 Page Mill Road
9  Palo Alto, CA  94304
   Tel:    +1.650.843.4000
10 Fax:    +1.650.843.4001

11 Attorneys for Respondents
   TWITTER, INC.; X HOLDINGS I, INC.;
12 X HOLDINGS, CORP; X CORP; ELON MUSK

13                    UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15

16

17 SARAH ANOKE, CATHERINE BONN,          Case No. 3:23-cv-02217
   ISABELLE CANNELL, MELANIE
18 EUSEBIO, SAMANTHA FESTEJO,            **DECLARATION OF ERIC MECKLEY IN
   CARLOS MOISES ORTIZ GOMEZ,            SUPPORT OF RESPONDENTS' NOTICE
19 DAWN HOISE, WAYNE KRUG,               OF REMOVAL OF ACTION TO THE
   LAURENT LUCE, PATRICK                 UNITED STATES DISTRICT COURT FOR
20 O'CONNELL, JENNIFER RYAN, JAIME       THE NORTHERN DISTRICT OF
   SENA, JAMES SHOBE, KARYN              CALIFORNIA**
21 THOMPSON, AND CRISTIAN ZAPATA,

22                  Petitioners,

23           v.

24 TWITTER, INC., X HOLDINGS I, INC.,
   X HOLDINGS, CORP, X CORP, AND
25 ELON MUSK,

26                  Respondents.

27

28

1

## DECLARATION OF ERIC MECKLEY

2      I, Eric Meckley, declare as follows:

3      1.      I am an attorney duly licensed to practice law in the state of California.  I am an

4   attorney with the law firm of Morgan, Lewis & Bockius LLP, and am counsel for counsel for

5   Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings"), and Elon Musk in the

6   above-captioned matter.  I submit this Declaration in support of Respondents' Notice of Removal.

7   I have personal knowledge of the facts stated in this Declaration and could testify competently to

8   them if asked to do so.

9      2.      On February 24, 2023, counsel for Petitioners, Sarah Anoke, Catherine Bonn,

10  Isabelle Cannell, Melanie Eusebio, Samantha Festejo, Carlos Moises Ortiz Gomez, Dawn Hoise,

11  Wayne Krug, Laurent Luce, Patrick O'Connell, Jennifer Ryan, Jaime Sena, James Shobe, Karyn

12  Thompson, and Cristian Zapata ("Petitioners"), submitted demands for arbitration on behalf of

13  Petitioners to the third-party arbitrator provider JAMS.  My firm represents Twitter as outside

14  counsel in these arbitrations, as well as Respondents X Holdings I, Inc. and Elon Musk.  My law

15  firm is counsel of record for Twitter, X Holdings I, Inc., and Elon Musk in each of these fifteen (15)

16  individual arbitrations.

17     3.      Petitioners' demands for arbitration allege violations of various federal and state law

18  claims.  Specifically, all fifteen (15) demands for arbitration allege claims for violations of the

19  federal Worker Adjustment and Retraining Notification ("WARN") Act pursuant to 29 U.S.C.

20  § 2101 *et seq.*, as well as claims of employment discrimination pursuant to 42 U.S.C. § 2000e.  In

21  addition, Petitioners Cannell's, Eusebio's, Gomez's, and Sena's demands for arbitration allege

22  violations of the Americans with Disabilities Act ("ADA") pursuant to 2 U.S.C. § 12101 *et seq.*,

23  Petitioners Festego's, Gomez's, and Shobe's demands for arbitration allege violations of the Family

24  and Medical Leave Act ("FMLA") pursuant to 29 U.S.C. § 2615(a), and Petitioner Thompson's

25  demand for arbitration alleges age discrimination in violation of 29 U.S.C. § 621 *et seq.*

26     4.      Attached as **Exhibit A** is a true and correct copy of the Demand for Arbitration that

27  Petitioner Sarah Anoke submitted to JAMS on February 24, 2023.  Anoke's Demand for Arbitration

28

1  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42 U.S.C.

2  § 2000e (federal discrimination).  *See* Demand for Arbitration, Pars. 166-176, 182-194.

3          5.        Attached as **<u>Exhibit B</u>** is a true and correct copy of the Demand for Arbitration that

4  Petitioner Catherine Bonn submitted to JAMS on February 24, 2023.  Bonn's Demand for

5  Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42

6  U.S.C. § 2000e (federal discrimination).  *See* Demand for Arbitration, Pars. 165-175, 176-187.

7          6.        Attached as **<u>Exhibit C</u>** is a true and correct copy of the Demand for Arbitration that

8  Petitioner Isabelle Cannell submitted to JAMS on February 24, 2023.  Cannell's Demand for

9  Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act), 42 U.S.C.

10 § 2000e (federal discrimination), and 2 U.S.C. § 12101 *et seq.* (the ADA).  *See* Demand for

11 Arbitration, Pars. 173-182, 183-194, 203-207.

12         7.        Attached as **<u>Exhibit D</u>** is a true and correct copy of the Demand for Arbitration that

13 Petitioner Melanie Eusebio submitted to JAMS on February 24, 2023.  Eusebio's Demand for

14 Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act), 42 U.S.C.

15 § 2000e (federal discrimination), and 2 U.S.C. § 12101 *et seq.* (the ADA).  *See* Demand for

16 Arbitration, Pars. 174-184, 189-201, 202-206.

17         8.        Attached as **<u>Exhibit E</u>** is a true and correct copy of the Demand for Arbitration that

18 Petitioner Samantha Festejo submitted to JAMS on February 24, 2023.  Festejo's Demand for

19 Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act), 42 U.S.C.

20 § 2000e (federal discrimination), and 29 U.S.C. § 2615(a) (the FMLA).  *See* Demand for

21 Arbitration, Pars. 164-174, 175-191, 192-203.

22         9.        Attached as **<u>Exhibit F</u>** is a true and correct copy of the Demand for Arbitration that

23 Petitioner Carlos Moises Ortiz Gomez submitted to JAMS on February 24, 2023.  Gomez's

24 Demand for Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN

25 Act), 42 U.S.C. § 2000e (federal discrimination), and 2 U.S.C. § 12101 *et seq.* (the ADA).  *See*

26 Demand for Arbitration, Pars. 176-177, 178-189, 195-199.

27         10.       Attached as **<u>Exhibit G</u>** is a true and correct copy of the Demand for Arbitration that

28 Petitioner Dawn Hoise submitted to JAMS on February 24, 2023.  Hoise's Demand for Arbitration

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

Case No. 3:23-cv-02217

DECLARATION OF ERIC MECKLEY IN SUPPORT OF RESPONDENTS' NOTICE OF REMOVAL

1  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42 U.S.C. §

2  2000e (federal discrimination). *See* Demand for Arbitration, Pars. 166-176, 177-190.

3      11.     Attached as **Exhibit H** is a true and correct copy of the Demand for Arbitration that

4  Petitioner Wayne Krug submitted to JAMS on February 24, 2023.  Krug's Demand for Arbitration

5  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42 U.S.C. §

6  2000e (federal discrimination). *See* Demand for Arbitration, Pars. 165-175, 176-189.

7      12.     Attached as **Exhibit I** is a true and correct copy of the Demand for Arbitration that

8  Petitioner Laurent Luce submitted to JAMS on February 24, 2023.  Luce's Demand for Arbitration

9  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42 U.S.C. §

10  2000e (federal discrimination). *See* Demand for Arbitration, Pars. 165-175, 180-193.

11      13.     Attached as **Exhibit J** is a true and correct copy of the Demand for Arbitration that

12  Petitioner Patrick O'Connell submitted to JAMS on February 24, 2023.  O'Connell's Demand for

13  Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42

14  U.S.C. § 2000e (federal discrimination). *See* Demand for Arbitration, Pars. 165-175, 176-188.

15      14.     Attached as **Exhibit K** is a true and correct copy of the Demand for Arbitration that

16  Petitioner Jennifer Ryan submitted to JAMS on February 24, 2023.  Ryan's Demand for Arbitration

17  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42 U.S.C. §

18  2000e (federal discrimination). *See* Demand for Arbitration, Pars. 165-175, 176-187.

19      15.     Attached as **Exhibit L** is a true and correct copy of the Demand for Arbitration that

20  Petitioner Jaime Sena submitted to JAMS on February 24, 2023.  Sena's Demand for Arbitration

21  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act), 42 U.S.C. § 2000e

22  (federal discrimination), and 2 U.S.C. § 12101 *et seq.* (the ADA).  *See* Demand for Arbitration,

23  Pars. 165-175, 185-196, 197-201.

24      16.     Attached as **Exhibit M** is a true and correct copy of the Demand for Arbitration that

25  Petitioner James Shobe submitted to JAMS on February 24, 2023.  Shobe's Demand for Arbitration

26  alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act), 42 U.S.C. § 2000e

27  (federal discrimination), and 29 U.S.C. § 2615(a) (the FMLA).  *See* Demand for Arbitration, Pars.

28  175-185, 186-197, 198-203.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3                                          Case No. 3:23-cv-02217
DECLARATION OF ERIC MECKLEY IN SUPPORT OF RESPONDENTS' NOTICE OF REMOVAL

17.     Attached as **<u>Exhibit N</u>** is a true and correct copy of the Demand for Arbitration that Petitioner Karyn Thompson submitted to JAMS on February 24, 2023.  Thompson's Demand for Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act), 42 U.S.C. § 2000e (federal discrimination), and 29 U.S.C. § 621 *et seq.* (the ADEA).  *See* Demand for Arbitration, Pars. 165-175, 176-187, 195-199.

18.     Attached as **<u>Exhibit O</u>** is a true and correct copy of the Demand for Arbitration that Petitioner Cristian Zapata submitted to JAMS on February 24, 2023.  Zapata's Demand for Arbitration alleges claims for violations of 29 U.S.C. § 2101 *et seq.* (federal WARN Act) and 42 U.S.C. § 2000e (federal discrimination)*.  See* Demand for Arbitration, Pars. 165-175, 176-188.

19.     On April 27, 2023, Petitioners filed a Petition to Compel Arbitration in San Francisco County Superior Court, seeking to compel each of these fifteen (15) individual arbitrations, and requesting that Respondents pay JAMS case initiation fees and all of Petitioners' reasonable attorneys' fees and costs related to the arbitrations.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 5th day of May, 2023, at San Francisco, California.

*/s/ Eric Meckley*
Eric Meckley

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4                                                  Case No. 3:23-cv-02217

DECLARATION OF ERIC MECKLEY IN SUPPORT OF RESPONDENTS' NOTICE OF REMOVAL

# EXHIBIT A

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.



📞 **1-800-352-JAMS**

🖥️ **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form  (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| | |
|---|---|
| RESPONDENT NAME | Twitter, Inc. |
| ADDRESS | 1355 Market St #900 |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94103 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 222-9670 | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94105 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7.**

| | |
|---|---|
| CLAIMANT NAME | Sarah Anoke |
| ADDRESS | ███████████ |

| CITY | STATE | ZIP |
|---|---|---|
| Tulsa | OK | ████ |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen |
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. |
| ADDRESS | 1700 Broadway, 16th Floor |

| CITY | STATE | ZIP |
|---|---|---|
| New York | NY | 10019 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (212) 400-4930 | (866) 221-6122 | acohen@kusklaw.com |



# Demand for Arbitration Form  (continued)
Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐  If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.*

### ARBITRATION PROVISION LOCATION

Anoke Sarah - DRA.pdf (attached)

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

| REQUESTED LOCATION | Per Attached DRA, within 45 miles of ███████████ Tulsa, OK ███ |
|---|---|

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See: Comprehensive Rule 16.1*

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION
Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE: JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter. In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS
If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES
**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | X Holdings I, Inc. |
| ADDRESS | 1209 ORANGE ST |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | Wilmington | | DE | | 19801 |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | | | | | |

### RESPONDENT·S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | San Francisco | | CA | | 94105 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | Elon Musk |
| ADDRESS | 1355 Market St #900 |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | San Francisco | | CA | | 94103 |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | | | | | |

### RESPONDENT·S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | San Francisco | | CA | | 94105 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

 # Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **SARAH ANOKE,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

**CLAIMANT'S DEMAND FOR ARBITRATION**

Claimant Sarah Anoke ("Sarah") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

I. **INTRODUCTION**

1.  This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.  Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and

representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.    Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter

2

represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.  Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11. As detailed below, that worked; Sarah relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12. On January 4, 2023, after the close of the merger, Sarah was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II. ARBITRATION PROVISION

13. This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Sarah signed. A copy of Sarah's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14. There is no arbitration agreement between Sarah and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Sarah's employment with Twitter.

## III.    PARTIES

15. Claimant Sarah Anoke is a former Twitter employee residing in Tulsa, Oklahoma. While employed at Twitter, Sarah worked from her home, located in Tulsa, Oklahoma, and reported to a manager located at Twitter's New York City, New York office.

16. Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930


17. Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20.  On information and belief, neither Twitter, X Holdings I, nor Musk is presently represented by counsel in connection with this action.

## IV.  FACTUAL BACKGROUND

### A.  Sarah Was A Dedicated Twitter Employee

21.  Sarah was employed by Twitter as a Sr. Staff User Researcher, reporting directly to Kendra Clarke in Twitter's New York City office.

22.  Sarah accepted her position with Twitter on or about July 8, 2020, began work on or about September 14, 2020, and remained continuously employed by Twitter until **she** was laid-off on January 4, 2023.

23.  Twitter made several promises **t**o Sarah during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24.  Other promises were made more recently, including promises that, Sarah would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25.  These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26.  Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

5

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content moderation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Sarah in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

10

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Sarah did, in fact, rely upon these representations.

82. The promised severance in fact factored into Sarah's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Sarah was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Sarah would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Sarah chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Sarah, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. For Sarah, the immediate termination from Twitter's systems had additional consequences. Although her layoff notice informed her that she would remain employed but in a "nonworking period," she immediately lost access to her Twitter email account. This, in turn, caused her to become immediately ineligible for a leadership development program she had been participating in.

102. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

103. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

104. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

105.     He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

106.     Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

107.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

108.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

109.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

110.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

111.     And yet again, that still wasn't enough.

112.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

113.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

114.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

115.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

116.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

117.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

118.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

119.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

16

120.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

121.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

122.    For that reason, Sarah – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

123.    Sarah restates and realleges each paragraph above as if fully stated herein.

124.    Sarah is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

125.    Twitter has breached the Merger Agreement by refusing to pay Sarah the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Sarah the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that **Sarah** *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Sarah will provide in briefing if and as necessary. **Sarah** raises the issue here as part of **her** duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

127.    As such, Sarah is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

128.    Sarah restates and realleges each paragraph above as if fully stated herein.

129.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

130.    Sarah accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

131.    Sarah provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2023.

132.    As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Sarah with the severance outlined in the Severance Policy Email, which she fully performed.

133.    Twitter has breached this agreement by refusing to pay Sarah the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Sarah.

134.    As such, Sarah is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

135.    Sarah restates and realleges each paragraph above as if fully stated herein.

136.    To the extent that Twitter's communications and Sarah's subsequent conduct somehow did not create an enforceable contract between Sarah and Twitter, Twitter's

representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

137.    The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

138.    Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

139.    It was reasonable for Sarah to rely upon that promise.

140.    Sarah did in fact rely upon that promise.

141.    Sarah was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

142.    Twitter's promise to provide Sarah with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Sarah with such severance.

143.    As such, Sarah is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### D.  Count Four (against Twitter): Breach of Offer Letter

144.    Sarah restates and realleges each paragraph above as if fully stated herein.

145.    On or about July 8, 2020, Sarah executed an offer letter from Twitter, which detailed the terms of Sarah's employment (the "Offer Letter").

146.    The Offer Letter constitutes a binding contract between Sarah and Twitter.

147.    The Offer Letter provides that Sarah will be eligible to receive benefits under the terms of Twitter's benefits plans.

148.    Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Sarah was entitled to receive the benefit of when Twitter terminated Sarah.

149.    Twitter did not provide Sarah with severance in accordance with its benefit plan.

150.    As such, Twitter breached the Offer Letter, and Sarah is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

151.    Sarah restates and realleges each paragraph above as if fully stated herein.

152.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

153.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

154.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

155.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

156.    Sarah did rely upon these representations.

157.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

158.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that

requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

159.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

160.    When it laid off Sarah, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

161.    As a result of Respondents' fraud, Sarah suffered damages.

162.    As such, Sarah is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

163.    In addition, Sarah is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

164.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

165.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Sarah agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations (29 U.S.C.A. § 2101 et seq.)**

166.    Sarah restates and realleges each paragraph above as if fully stated herein.

167.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

168.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

169.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Sarah.

170.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Sarah would remain employed but in a 'nonworking' status.

171.    However, Twitter has failed to continue to provide the laid-off employees (including Sarah) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

172.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

173.    Twitter also provided other "annually refreshing" benefits to its employees.

174.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Sarah, despite those employees continuing to be employed by Twitter on January 1, 2023.

175.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

176.    As a result of Twitter's violation of the WARN Act, Sarah is entitled to damages to be proven at hearing, including Sarah's benefits for the "Non-Working Notice period window" to which Sarah was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**G.  Count Seven: New York WARN Act Violations.**

177.     Sarah is a remote worker, and thus, for State and Federal WARN Act purposes, her single site of employment is the Twitter office in which her manager works.

178.     Under that standard Sarah's single site of employment is Twitter's New York City office.

179.     The New York State WARN Act, New York Labor Law Article 25-A et seq ("New York WARN Act") required Twitter to provide Sarah with 90 days' notice before it could terminate her, not merely 60 days' notice.

180.     Despite that, Twitter terminated Sarah on only 60 days' notice.

181.     As a result of Twitter's violation of the New York WARN Act, Sarah is entitled to damages to be proven at hearing, including Sarah's salary and benefits for the extra 30 days' notice to which Sarah was entitled, the value of any RSUs which would have vested in that 30-day period, the value of any RSU vests which would have been included in Sarah's severance had Sarah remained employed for that additional 30-day period, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**H.  Count Eight: Employment Discrimination**

182.     Sarah restates and realleges each paragraph above as if fully stated herein.

183.     Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

184.     For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

185.     In addition, both the New York Human Rights Law and Oklahoma law also bar discrimination in employment.

186.     Despite those laws, the anecdotal evidence currently available to Sarah indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

187.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

188.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

189.     Compounding these warning signs, Twitter has refused to respond to Sarah's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Sarah to confirm or rebut the picture painted by the available anecdotal information.

190.     Sarah is a woman.

191.     Sara is a Person of Color.

192.     On information and belief, Sarah was included in the mass layoff because she is a woman and a Person of Color.

193.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

194.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and **Sarah** is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

## I.   Count Nine: (Against Twitter, X Holdings I, and Musk): Wage Theft (Cal. Labor Code § 201-203)

195.     Sarah restates and realleges each paragraph above as if fully stated herein.

196.     Under each of Oklahoma, New York, and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

197.    Under Oklahoma, New York, and California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

198.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

199.    Under New York and Oklahoma law, engaging in such wage theft triggers a liquidated damages penalty of up to one hundred percent of the total amount of the wages found to be due.

200.    Under California law, the definition of "employer" against whom Sarah may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

201.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Sarah's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**J.   Count Ten (Against Musk): Piercing the Corporate Veil**

202.    Sarah restates and realleges each paragraph above as if fully stated herein.

203.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

204.    Musk, through X Holdings I, owns more than 50% of Twitter.

205.    Musk dominates Twitter's decision-making and operations.

206.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

207.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

25

208.     Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

209.     At Musk's direction, Twitter restored Anglin's account.

210.     Twitter has engaged in other content moderation decisions at Musk's whims.

211.     For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

212.     After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

213.     Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

214.     On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

215.     On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

216.     On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

217.     Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

218.     On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

219.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

220.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

221.    As such, Sarah is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI.    REQUEST FOR RELIEF

222.    Wherefore, Sarah Anoke respectfully requests that the Arbitrator:

    a.    Award Sarah compensatory damages in an amount to be proven at hearing;

    b.    Award Sarah penalty damages under the WARN Act and New York WARN Act, California, Oklahoma, New York and federal antidiscrimination laws;

    c.    Award Sarah liquidated damages under the California, Oklahoma, and New York Labor Law;

    d.    Award Sarah waiting time penalties under the California Labor Code;

    e.    Award Sarah punitive damages in the amount of $500,000,000.00;

    f.    Award Sarah costs and attorneys' fees as allowed by statute;

    g.    Award Sarah pre- and post-judgment interest; and

    h.    Award Sarah such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

_/s/ Akiva M. Cohen_
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7. The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9. Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED        Sarah Anoke

EMPLOYEE SIGNATURE           *Sarah Anoke*
                             Sarah Anoke (Jul 8, 2020 16:54 CDT)

Date:                        Jul 8, 2020



EXHIBIT B

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS


📞 **1-800-352-JAMS**
🖥️ **www.jamsadr.com**

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

---

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
   - *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
   - *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

   - *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| RESPONDENT NAME | Twitter, Inc. | | |
|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | |
| CITY | San Francisco | STATE CA | ZIP 94103 |
| PHONE | (415) 222-9670 | FAX | EMAIL |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| CLAIMANT NAME | Catherine Bonn | | |
|---|---|---|---|
| ADDRESS | ███████ | | |
| CITY | Wheat Ridge | STATE CO | ZIP ███ |
| PHONE | | FAX | EMAIL |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen | | |
|---|---|---|---|
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. | | |
| ADDRESS | 1700 Broadway, 16th Floor | | |
| CITY | New York | STATE NY | ZIP 10019 |
| PHONE | (212) 400-4930 | FAX (866) 221-6122 | EMAIL acohen@kusklaw.com |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS)

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach* <u>*two copies*</u> *of entire agreement.*

ARBITRATION PROVISION LOCATION

Bonn Catherine - DRA 2019 JAMS.pdf

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with* <u>*two copies*</u> *to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION    Per Attached DRA, within 45 miles of ████████ Boulder, CO ████

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE: JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter. In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | | |
| CITY | Wilmington | | STATE DE | | ZIP 19801 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | | STATE CA | | ZIP 94105 |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | | STATE CA | | ZIP 94103 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | | STATE CA | | ZIP 94105 |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | | |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CAUSE NO. _____

| | |
|---|---|
| **CATHERINE BONN,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Catherine Bonn ("Catherine") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

## I.   INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.     The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.     On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.     As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.     Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.     That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.  Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.  As detailed below, that worked; Catherine relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.  On January 4, 2023, after the close of the merger, Catherine was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Catherine signed. A copy of Catherine's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Catherine and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Catherine's employment with Twitter.

## III.     PARTIES

15.  Claimant Catherine Bonn is a former Twitter employee residing in Colorado. While employed at Twitter, Catherine worked at Twitter's Boulder, Colorado office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20.  On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis &

Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.    FACTUAL BACKGROUND

### A.  Catherine Was A Dedicated Twitter Employee

21.  Catherine was employed by Twitter as a Machine Learning Engineer.

22.  Catherine accepted her position with Twitter on or about September 26, 2019, began work on or about October 28, 2019, and remained continuously employed by Twitter until she was laid off on January 4, 2023.

23.  Twitter made several promises to Catherine during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24.  Other promises were made more recently, including promises that, Catherine would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25.  These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26.  Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27.  Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

5

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C.  Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62.  Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63.  The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64.  It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65.  After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66.  Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67.  In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68.  Catherine in fact learned that information from Twitter.

69.  These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70.  After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71.  When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Catherine did, in fact, rely upon these representations.

82. The promised severance in fact factored into Catherine's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Catherine was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84.  In fact, Catherine explored opportunities to secure different employment, but discontinued her search in light of Twitter's representations.

85. Instead, Catherine chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees, in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Catherine, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106. Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.    And yet again, that still wasn't enough.

111.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

15

115.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.    On information and belief, Musk routinely violates agreements as a that would require him to expend money matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.    For that reason, Catherine – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the

amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V. CAUSES OF ACTION

### A. Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.    Catherine restates and realleges each paragraph above as if fully stated herein.

123.    Catherine is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.    Twitter has breached the Merger Agreement by refusing to pay Catherine the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Catherine the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.    As such, Catherine is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B. Count Two: (against Twitter) Breach of Oral Contract

127.    Catherine restates and realleges each paragraph above as if fully stated herein.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Catherine *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Catherine will provide in briefing if and as necessary. Catherine raises the issue here as part of her duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

128.     The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.     Catherine accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.     Catherine provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2023.

131.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Catherine with the severance outlined in the Severance Policy Email, which she fully performed.

132.     Twitter has breached this agreement by refusing to pay Catherine the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Catherine.

133.     As such, Catherine is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.     Catherine restates and realleges each paragraph above as if fully stated herein.

135.     To the extent that Twitter's communications and Catherine's subsequent conduct somehow did not create an enforceable contract between Catherine and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

18

137.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.     It was reasonable for Catherine to rely upon that promise.

139.     Catherine did in fact rely upon that promise.

140.     Catherine was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

141.     Twitter's promise to provide Catherine with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Catherine with such severance.

142.     As such, Catherine is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### D.  Count Four (against Twitter): Breach of Offer Letter

143.     Catherine restates and realleges each paragraph above as if fully stated herein.

144.     On or about September 26, 20219, Catherine executed an offer letter from Twitter, which detailed the terms of Catherine's employment (the "Offer Letter").

145.     The Offer Letter constitutes a binding contract between Catherine and Twitter.

146.     The Offer Letter provides that Catherine will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Catherine was entitled to receive the benefit of when Twitter terminated Catherine.

148.     Twitter did not provide Catherine with severance in accordance with its benefit plan.

149.    As such, Twitter breached the Offer Letter, and Catherine is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.    Catherine restates and realleges each paragraph above as if fully stated herein.

151.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.    Catherine did rely upon these representations.

156.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158.     On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.     When it laid off Catherine, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.     As a result of Respondents' fraud, Catherine suffered damages.

161.     As such, Catherine is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.     In addition, Catherine is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.     On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.     In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Catherine agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations**

165.     Catherine restates and realleges each paragraph above as if fully stated herein.

166.     The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Catherine.

169.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Catherine would remain employed but in a 'nonworking' status.

170.    However, Twitter has failed to continue to provide the laid-off employees (including Catherine) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.    Twitter also provided other "annually refreshing" benefits to its employees.

173.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Catherine, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.    As a result of Twitter's violation of the WARN Act, Catherine is entitled to damages to be proven at hearing, including Catherine's benefits for the "Non-Working Notice period window" to which Catherine was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Employment Discrimination

176.    Catherine restates and realleges each paragraph above as if fully stated herein.

177.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

22

178.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

179.    In addition, Colorado Anti-Discrimination Act bars discrimination in Colorado employment.

180.    Despite those laws, the anecdotal evidence currently available to Catherine indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

181.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

182.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

183.    Compounding these warning signs, Twitter has refused to respond to Catherine's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Catherine to confirm or rebut the picture painted by the available anecdotal information.

184.    Catherine is a queer woman.

185.    On information and belief, Catherine was included in the mass layoff because she is queer, and/or because she is a woman.

186.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

187.    As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Catherine is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

### H. Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft

188.    Catherine restates and realleges each paragraph above as if fully stated herein.

189.    Under California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

190.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

191.    Under California law, the definition of "employer" against whom Catherine may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

192.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Catherine's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### I. Count Nine (Against Musk): Piercing the Corporate Veil

193.    Catherine restates and realleges each paragraph above as if fully stated herein.

194.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

195.    Musk, through X Holdings I, owns more than 50% of Twitter.

196.    Musk dominates Twitter's decision-making and operations.

197.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

198.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

199.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

200.    At Musk's direction, Twitter restored Anglin's account.

201.    Twitter has engaged in other content moderation decisions at Musk's whims.

202.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

203.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

204.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

205.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

206.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

207.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

208.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

209.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

210.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

211.     Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

212.     As such, Catherine is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

**VI.    REQUEST FOR RELIEF**

213.     Wherefore, Catherine Bonn respectfully requests that the Arbitrator:

a.  Award Catherine compensatory damages in an amount to be proven at hearing;

b.  Award Catherine penalty damages under the WARN Act and federal and state antidiscrimination laws;

c.  Award Catherine waiting time penalties under the California Labor Code;

d.  Award Catherine punitive damages in the amount of $500,000,000.00;

e.  Award Catherine costs and attorneys' fees as allowed by statute;

f.  Award Catherine pre- and post-judgment interest; and

g.  Award Catherine such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

_/s/ Akiva M. Cohen_
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.





## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

 

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED      *Catherine E Bonn*
                           Catherine E Bonn (Sep 26, 2019)

EMPLOYEE SIGNATURE         Catherine E Bonn

Date:                      Sep 26, 2019

# EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.



📞 **1-800-352-JAMS**

🖥 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Twitter, Inc. |
| **ADDRESS** | 1355 Market St #900 |
| **CITY** | San Francisco  **STATE** CA  **ZIP** 94103 |
| **PHONE** | (415) 222-9670  **FAX**  **EMAIL** |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Brian D. Berry |
| **FIRM/COMPANY** | Morgan, Lewis & Bockius LLP |
| **ADDRESS** | One Market, Spear Street Tower |
| **CITY** | San Francisco  **STATE** CA  **ZIP** 94105 |
| **PHONE** | (415) 442-1000  **FAX** (415) 442-1001  **EMAIL** brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Isabelle Cannell |
| **ADDRESS** | ▮▮▮▮▮▮ |
| **CITY** | Seattle  **STATE** WA  **ZIP** ▮▮▮ |
| **PHONE** | **FAX**  **EMAIL** |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Akiva M. Cohen |
| **FIRM/COMPANY** | Kamerman, Uncyk, Soniker & Klein, P.C. |
| **ADDRESS** | 1700 Broadway, 16th Floor |
| **CITY** | New York  **STATE** NY  **ZIP** 10019 |
| **PHONE** | (212) 400-4930  **FAX** (866) 221-6122  **EMAIL** acohen@kusklaw.com |

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐      If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

ARBITRATION PROVISION LOCATION

Cannell Izzy - DRA JAMS.pdf

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION    Per Attached DRA, within 45 miles of 1501 4th Ave. Suite 1900, Seattle, WA, 981

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: Comprehensive Rule 16.1*

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000       ☐ $100,000 to $250,000       ☐ More than $250,000       ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | | |
| CITY | Wilmington | STATE | DE | ZIP | 19801 |
| PHONE | | FAX | | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94103 |
| PHONE | | FAX | | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

 # Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **ISABELLE CANNELL,** | |
| **CLAIMANT,** | |
| **V.** | |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | **JAMS** |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Isabelle Cannell ("Isabelle") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.  This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.  Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.  Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.    That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.     Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Isabelle relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.   On January 4, 2023, after the close of the merger, Isabelle was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Isabelle signed. A copy of Isabelle's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Isabelle and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Isabelle's employment with Twitter.

### III.    PARTIES

15.  Claimant Isabelle Cannell is a former Twitter employee residing in Seattle, Washington. While employed at Twitter, Isabelle was assigned to, and primarily worked from, the Seattle, Washington office, located at 1501 4th Avenue, Suite 1900, Seattle, Washington 98101.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20.  On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis &

Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.    FACTUAL BACKGROUND

### A.  Isabelle Was A Dedicated Twitter Employee

21.  Isabelle is a Real Estate Manager and was employed by Twitter as a Senior Mgr. Real Estate Workplace Data Strategy & Analytics and reported to Elaine Wolfe, Director Global Planning.

22.  Isabelle accepted her position with Twitter on or about August 26, 2021, began work on or about September 28, 2021, and remained continuously employed by Twitter until she was laid off on January 4, 2023.

23.  Twitter made several promises to Isabelle during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24.  Other promises were made more recently, including promises that, Isabelle would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25.  These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26.  Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27.  Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28.  Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29.  During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30.  He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31.  On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32.  Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33.  Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34.  He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35.  After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36.  Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

8

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Isabelle in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

  - Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

  - Pro-rated Performance Bonus Plan compensation at target

  - Cash value of equity that would have vested within three months from the separation date

  - A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Isabelle did, in fact, rely upon these representations.

82. The promised severance in fact factored into Isabelle's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Isabelle was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Isabelle would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Isabelle chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Isabelle, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

14

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

15

113.     After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.     Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.     The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.     All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.     The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.     Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.     The failure to pay the severance explicitly promised in the severance agreement is not the only promise that Twitter made to Isabelle that Twitter and Musk have broken. Twitter provides Tweeps with reimbursement for fertility and other family-forming services (the "Carrot

Services") through a provider called Carrot. Carrot Services are provided free of charge to all Tweeps who elect to sign up for them.

120.     Tweeps who use Carrot Services may either elect to receive a payment card (the "Carrot Card") to pay for covered family formation expenses such as in-vitro fertilization, egg freezing, adoption, and doula services, or they may put such expenses on a personal credit card and receive reimbursement. Tweeps are reimbursed for up to $40,000 in Carrot Services every year, up to an $80,000 lifetime maximum. Reimbursements provided through Carrot are treated, and taxed, as additional income.

121.     After the merger agreement closed, Tweeps who used Carrot to pay for family formation services had their Carrot Cards declined when they attempted to pay. Tweeps who reached out to Carrot for an explanation were told that Twitter's required funding payments had not arrived, and that Carrot was unable, in turn, to pay for the Carrot Services.

122.     Many of the services Carrot covers are expensive and time-sensitive. Tweeps in the middle of fertility treatments scrambled to find funds to pay for thousands (or tens of thousands) of dollars' worth of Carrot Services to complete treatment cycles that they had begun in reliance on the Carrot Benefit's promised availability.

123.     Isabelle submitted timely requests to have family formation expenses which she had incurred, and which she had paid for using a personal credit card, reimbursed in accordance with Twitter's contractual obligations. These requests have been refused.

124.     On December 29, 2022, Tweeps who used the Carrot Services received an email from Carrot (the "Carrot Reduction Email"). This email read in relevant part:

> Starting January 1, 2023, Twitter's lifetime maximum for fertility health and
> family forming journeys will reduce to $40,000 (or equivalent in local
> currency).

This change reduced the Carrot Benefit to 50% of its former value. Tweeps who had planned their Carrot Services usage in reliance on the program's promised availability to maximize their value found themselves facing the exhaustion not merely of their annual maximum, but of the lifetime maximum –only two days before they had reasonably expected those benefits to refresh on January 1, 2023.

125.     Not only did this sudden change in benefit levels severely disrupt the family-forming plans of many Tweeps – including Isabelle – it also represents a significant reduction in continuing employee benefits, which Section 6.9(a) of the Merger Agreement represented would remain "substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time."

126.     On information and belief, no new benefits are being provided which would offset the reduction caused by the alteration in the Carrot Services.

127.     On information and belief, Musk routinely violates agreements as a that would require him to expend money matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

128.     In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

129.     For that reason, Isabelle – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

130.    Isabelle restates and realleges each paragraph above as if fully stated herein.

131.    Isabelle is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

132.    Twitter has breached the Merger Agreement by refusing to pay Isabelle the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

133.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Isabelle the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

134.    As such, Isabelle is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B.  Count Two: (against Twitter) Breach of Oral Contract

135.    Isabelle restates and realleges each paragraph above as if fully stated herein.

136.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

137.    Isabelle accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Isabelle *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Isabelle will provide in briefing if and as necessary. Isabelle raises the issue here as part of her duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

138.     Isabelle provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2022.

139.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Isabelle with the severance outlined in the Severance Policy Email, which she fully performed.

140.     Twitter has breached this agreement by refusing to pay Isabelle the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Isabelle.

141.     As such, Isabelle is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

142.     Isabelle restates and realleges each paragraph above as if fully stated herein.

143.     To the extent that Twitter's communications and Isabelle's subsequent conduct somehow did not create an enforceable contract between Isabelle and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

144.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

145.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

146.     It was reasonable for Isabelle to rely upon that promise.

147.     Isabelle did in fact rely upon that promise.

148.     Isabelle was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

149.     Twitter's promise to provide Isabelle with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Isabelle with such severance.

150.     As such, Isabelle is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

151.     Isabelle restates and realleges each paragraph above as if fully stated herein.

152.     On or about August 26, 2021, Isabelle executed an offer letter from Twitter, which detailed the terms of Isabelle's employment (the "Offer Letter").

153.     The Offer Letter constitutes a binding contract between Isabelle and Twitter.

154.     The Offer Letter provides that Isabelle will be eligible to receive benefits under the terms of Twitter's benefits plans.

155.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Isabelle was entitled to receive the benefit of when Twitter terminated Isabelle.

156.     Twitter did not provide Isabelle with severance in accordance with its benefit plan.

157.     As such, Twitter breached the Offer Letter, and Isabelle is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

158.     Isabelle restates and realleges each paragraph above as if fully stated herein.

159.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

160.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

161.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

162.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

163.    Isabelle did rely upon these representations.

164.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

165.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

166.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

167.    When it laid off Isabelle, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

168.    As a result of Respondents' fraud, Isabelle suffered damages.

169.    As such, Isabelle is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

170.    In addition, Isabelle is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

171.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

172.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Isabelle agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

### F.  Count Six: WARN Act Violations

173.    Isabelle restates and realleges each paragraph above as if fully stated herein.

174.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

175.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

176.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Isabelle.

177.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Isabelle would remain employed but in a 'nonworking' status.

178.    However, Twitter has failed to continue to provide the laid-off employees (including Isabelle) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

179.    Twitter also provided other "annually refreshing" benefits to its employees.

180.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Isabelle, despite those employees continuing to be employed by Twitter on January 1, 2023.

181.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

182.    As a result of Twitter's violation of the WARN Act, Isabelle is entitled to damages to be proven at hearing, including Isabelle's benefits for the "Non-Working Notice period window" to which Isabelle was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Employment Discrimination

183.    Isabelle restates and realleges each paragraph above as if fully stated herein.

184.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

185.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

186.     In addition, Washington antidiscrimination laws, including RCW 49.60.030 and 49.60.180(2), similarly prohibit discrimination in employment.

187.     Despite those laws, the anecdotal evidence currently available to Isabelle indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

188.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

189.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

190.     Compounding these warning signs, Twitter has refused to respond to Isabelle's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Isabelle to confirm or rebut the picture painted by the available anecdotal information.

191.     Isabelle is female.

192.     On information and belief, Isabelle was included in the mass layoff because she is female.

193.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

194.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Isabelle is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**H. Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft**

195.     Isabelle restates and realleges each paragraph above as if fully stated herein.

196.     Under both Washington and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

197.    Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

198.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

199.    Under Washington law, an employer who willfully pays less than all wages due by the statutory deadline is liable for both compensatory damages and double exemplary damages, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

200.    Twitter's choice to pay Isabelle less than the severance guaranteed to her under the Severance Stability Promise was made willfully, with the intent to deprive her of her rightful wages, in violation of RCW 49.52.050(2).

201.    Under Washington and California law, Isabelle may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

202.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Isabelle's unpaid severance, waiting time penalties, and liquidated and exemplary damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## I.    Count Nine: Violations of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*, Cal. Gov. Code § 12940, and RCW 49.60.180(2).

203.    Isabelle restates and realleges each paragraph above as if fully stated herein.

204.    Isabelle has an autoimmune disorder.

205.    At the time she was laid off, Isabelle's performance was rated on- or ahead-of-track.

206.    On information and belief, Isabelle's disability was a factor in Twitter's decision to lay her off.

207.    Twitter has thus violated Isabelle's rights under the ADA, and as such is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**J.    Count Ten (Against Musk): Piercing the Corporate Veil**

208.    Isabelle restates and realleges each paragraph above as if fully stated herein.

209.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

210.    Musk, through X Holdings I, owns more than 50% of Twitter.

211.    Musk dominates Twitter's decision-making and operations.

212.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

213.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

214.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

215.    At Musk's direction, Twitter restored Anglin's account.

216.    Twitter has engaged in other content moderation decisions at Musk's whims.

217.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

218.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

219.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

220.     On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

221.     On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

222.     On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

223.     Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

224.     On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

225.     On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

226.     Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

227.     As such, Isabelle is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

**VI.     REQUEST FOR RELIEF**

228.     Wherefore, Isabelle Cannell respectfully requests that the Arbitrator:

    a.     Award Isabelle compensatory damages in an amount to be proven at hearing;

    b.     Award Isabelle penalty damages under the WARN Act and state and federal antidiscrimination laws;

c.   Award Isabelle liquidated and exemplary damages under the California and Washington Wage and Hour Acts;

d.   Award Isabelle waiting time penalties under the California Labor Code;

e.   Award Isabelle punitive damages in the amount of $500,000,000.00;

f.   Award Isabelle costs and attorneys' fees as allowed by statute;

g.   Award Isabelle pre- and post-judgment interest; and

h.   Award Isabelle such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,


  */s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

29

# DISPUTE RESOLUTION AGREEMENT

> **This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**
>
> **You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.





## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED     Isabelle Cannell

EMPLOYEE SIGNATURE        Isabelle Cannell (Aug 26, 2021 10:26 PDT)

Date:                     Aug 26, 2021

Exhibit

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.



📞 **1-800-352-JAMS**
💻 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Twitter, Inc. |
| **ADDRESS** | 1355 Market St #900 |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94103 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 222-9670 | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Brian D. Berry |
| **FIRM/COMPANY** | Morgan, Lewis & Bockius LLP |
| **ADDRESS** | One Market, Spear Street Tower |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94105 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Melanie Eusebio |
| **ADDRESS** | ▮▮▮▮▮▮▮▮▮▮ |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | ▮▮▮ |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Akiva M. Cohen |
| **FIRM/COMPANY** | Kamerman, Uncyk, Soniker & Klein, P.C. |
| **ADDRESS** | 1700 Broadway, 16th Floor |

| CITY | STATE | ZIP |
|---|---|---|
| New York | NY | 10019 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (212) 400-4930 | (866) 221-6122 | acohen@kusklaw.com |

# Demand for Arbitration Form (continued)

### Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.*

**ARBITRATION PROVISION LOCATION**

Eusebio Melanie DRA.pdf

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   Per Attached DRA, within 45 miles of 1355 Market St #900, San Francisco, CA 9

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See: **Comprehensive Rule 16.1***

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE: JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter. In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. |
|---|---|

| ADDRESS | 1209 ORANGE ST |
|---|---|

| CITY | Wilmington | STATE | DE | ZIP | 19801 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

RESPONDENT·S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk |
|---|---|

| ADDRESS | 1355 Market St #900 |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94103 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

RESPONDENT·S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

 # Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY |
|---|

| FIRM/ COMPANY |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY |
|---|

| FIRM/ COMPANY |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| MELANIE EUSEBIO HARDJADIPARTA, | |
| CLAIMANT, | |
| V. | JAMS |
| TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK, | |
| RESPONDENTS. | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Melanie Eusebio Hardjadiparta ("Melanie") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.    Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

2

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.  Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.  As detailed below, that worked; Melanie relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12. On January 4, 2023, after the close of the merger, Melanie was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II. ARBITRATION PROVISION

13. This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Melanie signed. A copy of Melanie's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14. There is no arbitration agreement between Melanie and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Melanie's employment with Twitter.

## III. PARTIES

15. Claimant Melanie Eusebio Hardjadiparta is a former Twitter employee residing in San Francisco, California. While employed at Twitter, Melanie worked at the San Francisco office.

16. Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

and

Ethan Jacobs
Ethan Jacobs Law Corporation
100 Pine St Suite 1250
San Francisco, CA 94111
ethan@ethanjacobslaw.com
415-275-0845

17. Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18. Respondent X Holdings I is a Delaware corporation.

19. Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.   FACTUAL BACKGROUND

### A.  Melanie Was a Dedicated Twitter Employee

21. Melanie is a product designer and was employed by Twitter as a Senior. Designer.

22. Melanie began working for Twitter as a contract employee in or around October 2018, accepted her position as full-time employee with Twitter on or about October 24, 2019, began work on or about November 11, 2019, and remained continuously employed by Twitter until she was laid off on January 4, 2023.

23. Twitter made several promises to Melanie during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Melanie would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

**B. Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered**

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such

8

Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Melanie in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Melanie did, in fact, rely upon these representations.

82. The promised severance in fact factored into Melanie's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Melanie was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Melanie would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Melanie chose to remain at Twitter.

**D.  Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

13

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Melanie, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

14

104.    He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105.    Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.    And yet again, that still wasn't enough.

111.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112. The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113. After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114. Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115. The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

16

119. The failure to pay the severance explicitly promised in the severance agreement is not the only promise that Twitter made to Melanie that Twitter and Musk have broken. Twitter provides Tweeps with reimbursement for fertility and other family-forming services (the "Carrot Services") through a provider called Carrot. Carrot Services are provided free of charge to all Tweeps who elect to sign up for them.

120. Tweeps who elect to use Carrot Services receive a payment card (the "Carrot Card") to pay for covered family formation expenses such as in-vitro fertilization, egg freezing, adoption, and doula services. Tweeps are reimbursed for up to $40,000 in Carrot Services every year, up to an $80,000 lifetime maximum. Reimbursements provided through Carrot are treated, and taxed, as additional income.

121. After the merger agreement closed, Tweeps who used Carrot to pay for family formation services had their Carrot Cards declined when they attempted to pay. Tweeps who reached out to Carrot for an explanation were told that Twitter's required funding payments had not arrived, and that Carrot was unable, in turn, to pay for the Carrot Services.

122. Many of the services Carrot covers are expensive and time-sensitive. Tweeps in the middle of fertility treatments scrambled to find funds to pay for thousands (or tens of thousands) of dollars' worth of Carrot Services to complete treatment cycles that they had begun in reliance on the Carrot Benefit's promised availability.

123. On December 29, 2022, Tweeps who used the Carrot Services received an email from Carrot (the "Carrot Reduction Email"). This email read in relevant part:

> Starting January 1, 2023, Twitter's lifetime maximum for fertility health and family forming journeys will reduce to $40,000 (or equivalent in local currency).

124. This change reduced the Carrot Benefit to 50% of its former value. Tweeps who had planned their Carrot Services usage in reliance on the program's promised availability to maximize

their value found themselves facing the exhaustion not merely of their annual maximum, but of the lifetime maximum –only two days before they had reasonably expected those benefits to refresh on January 1, 2023.

125.    Not only did this sudden change in benefit levels severely disrupt the family-forming plans of many Tweeps – including Melanie – it also represents a significant reduction in continuing employee benefits, which Section 6.9(a) of the Merger Agreement represented would remain "substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time."

126.    On information and belief, no new benefits are being provided which would offset the reduction caused by the alteration in the Carrot Services.

127.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

128.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

129.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

130.    For that reason, Melanie – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

131.    Melanie restates and realleges each paragraph above as if fully stated herein.

132.    Melanie is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

133.    Twitter has breached the Merger Agreement by refusing to pay Melanie the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

134.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Melanie the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

135.    As such, Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B.  Count Two: (against Twitter) Breach of Oral Contract

136.    Melanie restates and realleges each paragraph above as if fully stated herein.

137.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Melanie *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Melanie will provide in briefing if and as necessary. Melanie raises the issue here as part of her duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

138.     Melanie accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

139.     Melanie provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2023.

140.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Melanie with the severance outlined in the Severance Policy Email, which she fully performed.

141.     Twitter has breached this agreement by refusing to pay Melanie the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Melanie.

142.     As such, Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### C.  Count Three (in the alternative, against Twitter): Promissory Estoppel

143.     Melanie restates and realleges each paragraph above as if fully stated herein.

144.     To the extent that Twitter's communications and Melanie's subsequent conduct somehow did not create an enforceable contract between Melanie and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

145.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

146.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

147.     It was reasonable for Melanie to rely upon that promise.

148.    Melanie did in fact rely upon that promise.

149.    Melanie was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

150.    Twitter's promise to provide Melanie with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Melanie with such severance.

151.    As such, Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

152.    Melanie restates and realleges each paragraph above as if fully stated herein.

153.    On or about October 24, 2019, Melanie executed an offer letter from Twitter, which detailed the terms of Melanie's employment (the "Offer Letter").

154.    The Offer Letter constitutes a binding contract between Melanie and Twitter.

155.    The Offer Letter provides that Melanie will be eligible to receive benefits under the terms of Twitter's benefits plans.

156.    Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Melanie was entitled to receive the benefit of when Twitter terminated Melanie.

157.    Twitter did not provide Melanie with severance in accordance with its benefit plan.

158.    As such, Twitter breached the Offer Letter, and Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

159.    Melanie restates and realleges each paragraph above as if fully stated herein.

160.     In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

161.     Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

162.     In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

163.     On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

164.     Melanie did rely upon these representations.

165.     On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

166.     Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

167.     On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

168.     When it laid off Melanie, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

169.     As a result of Respondents' fraud, Melanie suffered damages.

170.     As such, Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

171.     In addition, Melanie is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

172.     On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

173.     In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Melanie agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations**

174.     Melanie restates and realleges each paragraph above as if fully stated herein.

175.     The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

176.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

177.     In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Melanie.

178.     Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Melanie would remain employed but in a 'nonworking' status.

179.     However, Twitter has failed to continue to provide the laid-off employees (including Melanie) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

180.     For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

181.     Twitter also provided other "annually refreshing" benefits to its employees.

182.     Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Melanie, despite those employees continuing to be employed by Twitter on January 1, 2023.

183.     Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

184.     As a result of Twitter's violation of the WARN Act, Melanie is entitled to damages to be proven at hearing, including Melanie's benefits for the "Non-Working Notice period window" to which Melanie was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Failure to Provide Accurate Wage Statements (Labor Code § 226(a))

185.     Melanie restates and realleges each paragraph above as if fully stated herein.

186.     California law requires employers to furnish accurate wage statements to all employees, including total hours worked by the employee, the inclusive dates of the period for which the employee is paid, and all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

24

187.     Melanie's final wage statement was inaccurate with respect to the total hours worked, the dates of the pay period, the hourly rate in effect, and the number of hours worked at that hourly rate.

188.     As such, Twitter has violated § 226 of the California Labor Code, and Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## H. Count Eight:  Employment Discrimination (42 U.S.C § 2000e and Cal. Government Code § 12940 et seq.)

189.     Melanie restates and realleges each paragraph above as if fully stated herein.

190.     Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

191.     For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

192.     Despite those laws, the anecdotal evidence currently available to Melanie indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

193.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

194.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

195.     Compounding these warning signs, Twitter has refused to respond to Melanie's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Melanie to confirm or rebut the picture painted by the available anecdotal information.

196.     Melanie is of Asian and Latino descent.

197.     Melanie is a woman.

198.     Melanie is LGBT.

199.     On information and belief, Melanie was included in the mass layoff because she is a gay woman of Asian and Latino descent.

200.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

201.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Melanie is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

## I.   Count Nine: Violations of the Americans with Disabilities Act and Related State Laws.

202.     Melanie restates and realleges each paragraph above as if fully stated herein.

203.     Melanie has ADHD.

204.     At the time he was laid off, Melanie's performance was rated on or ahead of track.

205.     On information and belief, Melanie's disability was a factor in Twitter's decision to lay her off.

206.     Twitter has thus violated Melanie's rights under the ADA and related state statutes, and as such is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## J.   Count Ten (Against Twitter, X Holdings I, and Musk): Wage Theft (Cal. Labor Code § 201-203)

207.     Melanie restates and realleges each paragraph above as if fully stated herein.

208.     Under California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

209.    Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

210.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

211.    Under California law, the definition of "employer" against whom Melanie may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

212.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Melanie's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**K.  Count Eleven (Against Musk): Piercing the Corporate Veil**

213.    Melanie restates and realleges each paragraph above as if fully stated herein.

214.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

215.    Musk, through X Holdings I, owns more than 50% of Twitter.

216.    Musk dominates Twitter's decision-making and operations.

217.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

218.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

219.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

220.    At Musk's direction, Twitter restored Anglin's account.

221.    Twitter has engaged in other content moderation decisions at Musk's whims.

222.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

223.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

224.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

225.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

226.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

227.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

228.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

229.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

230.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

231.     Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

232.     As such, Melanie is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

**L.   Count Twelve: Unpaid Expenses (California Labor Code § 2802)**

233.     Melanie restates and realleges each paragraph above as if fully stated herein.

234.     California law requires employers to indemnify employees for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties.

235.     Melanie incurred expenditures or losses in the amount of $887.00.

236.     Despite Melanie's attempts to submit these expenses in anticipation of reimbursement, Twitter did not reimburse her.

237.     As such, Melanie is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**VI.     REQUEST FOR RELIEF**

238.     Wherefore, Melanie Eusebio Hardjadiparta respectfully requests that the Arbitrator:

a.   Award Melanie compensatory damages in an amount to be proven at hearing;

b.   Award Melanie penalty damages under the WARN Act, California and federal antidiscrimination laws;

c.   Award Melanie liquidated damages under the California Wage and Hour Act and the California Wage Statement Act;

29

d.   Award Melanie waiting time penalties under the California Labor Code;

e.   Award Melanie punitive damages in the amount of $500,000,000.00;

f.   Award Melanie costs and attorneys' fees as allowed by statute;

g.   Award Melanie pre- and post-judgment interest; and

h.   Award Melanie such other and further relief as the Arbitrator deems

appropriate.

Respectfully Submitted,

  /s/  *Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

Ethan Jacobs

ETHAN JACOBS LAW CORPORATION
100 Pine St., Suite 1250
San Francisco, CA 94111
(415) 275-0845
ethan@ejacobslaw.com

# DISPUTE RESOLUTION AGREEMENT

This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.

You can choose to opt out of this Agreement – you have 30 days to opt out.

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.





## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED      Melanie Eusebio

EMPLOYEE SIGNATURE      *Melanie Eusebio*
Melanie Eusebio (Oct 24, 2019)

Date:      Oct 24, 2019

EXHIBIT E

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.



**1-800-352-JAMS**

**www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its* Employment Minimum Standards *where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| RESPONDENT NAME | Twitter, Inc. |
| ADDRESS | 1355 Market St #900 |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94103 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 222-9670 | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94105 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| CLAIMANT NAME | Samantha Festejo |
| ADDRESS | ▇▇▇▇▇▇▇ |

| CITY | STATE | ZIP |
|---|---|---|
| Seattle | WA | ▇▇▇ |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen |
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. |
| ADDRESS | 1700 Broadway, 16th Floor |

| CITY | STATE | ZIP |
|---|---|---|
| New York | NY | 10019 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (212) 400-4930 | (866) 221-6122 | acohen@kusklaw.com |



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐     If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach* <u>*two copies*</u> *of entire agreement.*

> ARBITRATION PROVISION LOCATION
>
> Festejo Samantha DRA.pdf (Attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with* <u>*two copies*</u> *to JAMS.*

## REQUEST FOR HEARING

| REQUESTED LOCATION | Per Attached DRA, within 45 miles of 1501 4th Ave, Seattle, WA, 98101 |
|---|---|

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | |
|---|---|---|---|

| ADDRESS | 1209 ORANGE ST | | |
|---|---|---|---|

| CITY | Wilmington | STATE | DE | ZIP | 19801 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/ COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | |
|---|---|---|---|

| ADDRESS | 1355 Market St #900 | | |
|---|---|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94103 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/ COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

 # Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CAUSE NO. _____

| | |
|---|---|
| **SAMANTHA FESTEJO,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Samantha Festejo ("Samantha") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.  This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.  Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.  Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.   The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.   As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.   Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

2

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Samantha relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.   On January 4, 2023, after the close of the merger, Samantha was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Samantha signed. A copy of Samantha's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Samantha and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Samantha's employment with Twitter.

## III.   PARTIES

15.  Claimant Samantha Festejo is a former Twitter employee residing in Washington. While employed at Twitter, Samantha worked at the Seattle office, located at 1501 4th Ave, Seattle, WA, 98101.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, neither Twitter, X Holdings I, nor Musk is presently represented by counsel in connection with this action.

IV.    **FACTUAL BACKGROUND**

A.  **Samantha Was A Dedicated Twitter Employee**

21. Samantha is a technical program manager, and was employed by Twitter as Senior Technical Program Manager.

22. Samantha accepted her position with Twitter on or about November 19, 2021, began work on or about January 10, 2022, and remained continuously employed by Twitter until she was laid off on January 4, 2023..

23. Twitter made several promises to Samantha during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Samantha would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

B.  **Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered**

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

5

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

6

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

7

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees.**" For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Samantha in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:
  - Two months base salary or On Target Earnings for employees on the Sales Incentive Plan
  - Pro-rated Performance Bonus Plan compensation at target
  - Cash value of equity that would have vested within three months from the separation date
  - A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Samantha did, in fact, rely upon these representations.

82. The promised severance in fact factored into Samantha's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Samantha was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Samantha would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Samantha chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Samantha, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.    And yet again, that still wasn't enough.

110.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

111.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

112.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

113.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

15

114. The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

115. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

116. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

117. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

118. On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

119. In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

120. For that reason, Samantha – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the

amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

121.    Samantha restates and realleges each paragraph above as if fully stated herein.

122.    Samantha is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

123.    Twitter has breached the Merger Agreement by refusing to pay Samantha the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

124.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Samantha the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged."

125.    As such, Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B.  Count Two: (against Twitter) Breach of Oral Contract

126.    Samantha restates and realleges each paragraph above as if fully stated herein.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Samantha *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Samantha will provide in briefing if and as necessary. Samantha raises the issue here as part of **her** duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

127.     The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

128.     Samantha accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

129.     Samantha provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2023.

130.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Samantha with the severance outlined in the Severance Policy Email, which she fully performed.

131.     Twitter has breached this agreement by refusing to pay Samantha the severance outlined in the Severance Policy Email and diminishing the benefits it made available to her.

132.     As such, Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

133.     Samantha restates and realleges each paragraph above as if fully stated herein.

134.     To the extent that Twitter's communications and Samantha's subsequent conduct somehow did not create an enforceable contract between Samantha and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

135.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

136.    Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

137.    It was reasonable for Samantha to rely upon that promise.

138.    Samantha did in fact rely upon that promise.

139.    Samantha was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

140.    Twitter's promise to provide Samantha with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Samantha with such severance.

141.    As such, Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

142.    Samantha restates and realleges each paragraph above as if fully stated herein.

143.    On or about November 19, 2021, Samantha executed an offer letter from Twitter, which detailed the terms of Samantha's employment (the "Offer Letter").

144.    The Offer Letter constitutes a binding contract between Samantha and Twitter.

145.    The Offer Letter provides that Samantha will be eligible to receive benefits under the terms of Twitter's benefits plans.

146.    Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Samantha was entitled to receive the benefit of when Twitter terminated Samantha.

147.    Twitter did not provide Samantha with severance in accordance with its benefit plan.

148.    As such, Twitter breached the Offer Letter, and Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

149.    Samantha restates and realleges each paragraph above as if fully stated herein.

150.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

151.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

152.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

153.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

154.    Samantha did rely upon these representations.

155.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

156.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

157.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

158.    When it laid off Samantha, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

159.    As a result of Respondents' fraud, Samantha suffered damages.

160.    As such, Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

161.    In addition, Samantha is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

162.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

163.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Samantha agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations (29 U.S.C.A. § 2101 et seq.)**

164.    Samantha restates and realleges each paragraph above as if fully stated herein.

165.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

166.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

167.     In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Samantha.

168.     Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Samantha would remain employed but in a 'nonworking' status.

169.     However, Twitter has failed to continue to provide the laid-off employees (including Samantha) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

170.     For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

171.     Twitter also provided other "annually refreshing" benefits to its employees.

172.     Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Samantha, despite those employees continuing to be employed by Twitter on January 1, 2023.

173.     Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

174.     As a result of Twitter's violation of the WARN Act, Samantha is entitled to damages to be proven at hearing, including Samantha's benefits for the "Non-Working Notice period window" to which Samantha was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: FMLA Interference (29 U.S.C.A. § 2615(a)(1) and RCW 50A.40.010(1)(a))

175.     Samantha restates and realleges each paragraph above as if fully stated herein.

176.     At the time she went on non-working leave, Samantha was pregnant.

177.    Although she was early in her pregnancy, Samantha had informed her manager at Twitter that she was pregnant, due to her need to attend multiple medical appointments related to her pregnancy.

178.    Twitter is covered by the FMLA.

179.    Samantha was entitled to leave under the FMLA.

180.    Although Samantha had not specifically informed Twitter of her intention to take family leave, Twitter would reasonably have been aware that Samantha was likely to elect to take family leave to which she was entitled.

181.    Twitter laid Samantha off while aware that she would likely exercise her rights under the FMLA to take parental leave, and to return to work at Twitter at the end of that leave.

182.    Twitter thus denied Samantha her right to take family leave under the FMLA.

183.    Twitter thus also denied Samantha her right to be reinstated in her position or the equivalent at the end of her leave.

184.    Twitter has thus interfered with Samantha's rights under the FMLA.

185.    As such, Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**H.  Count Eight: FMLA Retaliation (29 U.S.C.A. § 2615(a)(2), RCW 50A.40.010(1)(b))**

186.    Samantha restates and realleges each paragraph above as if fully stated herein.

187.    Although Samantha had not specifically informed Twitter of her intention to take family leave, Twitter would reasonably have been aware that Samantha was likely to elect to take family leave to which she was entitled.

188.    Twitter laid Samantha off while aware that she would likely exercise her rights under the FMLA to take parental leave, and to return to work at Twitter at the end of that leave.

23

189.     On information and belief, Samantha's reasonable expectation that she would take the leave to which she was entitled was a factor in Twitter's decision to lay her off.

190.     Twitter has thus retaliated against Samantha for her likely use of the leave to which she is entitled.

191.     As such, Samantha is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**I.   Count Nine: Employment Discrimination**

192.     Samantha restates and realleges each paragraph above as if fully stated herein.

193.     Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

194.     For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

195.     In addition, RCW 49.60.030 and 49.60.180(2) prohibit employment discrimination at the state level.

196.     Despite those laws, the anecdotal evidence currently available to Samantha indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

197.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

198.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

199.     Compounding these warning signs, Twitter has refused to respond to Samantha's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Samantha to confirm or rebut the picture painted by the available anecdotal information.

200.     Samantha is an Asian woman.

201.     On information and belief, Samantha was included in the mass layoff because she is an Asian woman.

202.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

203.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Samantha is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**J.   Count Ten (Against Twitter, X Holdings I, and Musk): Wage Theft**

204.     Samantha restates and realleges each paragraph above as if fully stated herein.

205.     Under both Washington and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

206.     Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

207.     Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

208.     Under both California and Washington law, Samantha may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

209.   Twitter's choice to pay Samantha less than the severance guaranteed to her under the Severance Stability Promise was made willfully, with the intent to deprive her of her rightful wages, in violation of RCW 49.52.050(2).

210.   Under Washington law, Samantha is entitled to treble damages.

211.   As such, Twitter, X Holdings I, and Musk are jointly and severally liable to Samantha for unpaid severance, waiting time penalties, and liquidated and exemplary damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**K.  Count Eleven (Against Musk): Piercing the Corporate Veil**

212.   Samantha restates and realleges each paragraph above as if fully stated herein.

213.   There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

214.   Musk, through X Holdings I, owns more than 50% of Twitter.

215.   Musk dominates Twitter's decision-making and operations.

216.   For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

217.   Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

218.   Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

219.   At Musk's direction, Twitter restored Anglin's account.

220.   Twitter has engaged in other content moderation decisions at Musk's whims.

221.   For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

222.     After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

223.     Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

224.     On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

225.     On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

226.     On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

227.     Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

228.     On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

229.     On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

230.     Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

231.     As such, Samantha is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI.     REQUEST FOR RELIEF

232.     Wherefore, Samantha Festejo respectfully requests that the Arbitrator:

    a.   Award Samantha compensatory damages in an amount to be proven at hearing;

    b.   Award Samantha penalty damages under the WARN Act, and state and federal antidiscrimination laws;

    c.   Award Samantha liquidated damages under Washington's minimum wage law;

    d.   Award Samantha waiting time penalties under the California Labor Code;

    e.   Award Samantha punitive damages in the amount of $500,000,000.00;

    f.   Award Samantha costs and attorneys' fees as allowed by statute;

    g.   Award Samantha pre- and post-judgment interest; and

    h.   Award Samantha such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,


               */ s/  Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1.  How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2.  Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before, and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

### 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

### 4. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first-class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

### 5. How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

### 6. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator'sand arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and anydisputes in that regard will be resolved by the Arbitrator.

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion ofpost-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority toenter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Jennifer Christie, Chief Human Resources Officer
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME
PRINTED                              Samantha Festejo

EMPLOYEE SIGNATURE             *Samantha Festejo*
                                Samantha Festejo (Nov 19, 2021 20:22 PST)

DATE                               Nov 19, 2021

EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.



📞 **1-800-352-JAMS**

🖥 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| | |
|---|---|
| RESPONDENT NAME | Twitter, Inc. |
| ADDRESS | 1355 Market St #900 |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94103 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 222-9670 | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94105 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7.**

| | |
|---|---|
| CLAIMANT NAME | Carlos Moises Ortiz Gomez |
| ADDRESS | ██████████████ |

| CITY | STATE | ZIP |
|---|---|---|
| Lake Stevens | WA | ████ |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen |
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. |
| ADDRESS | 1700 Broadway, 16th Floor |

| CITY | STATE | ZIP |
|---|---|---|
| New York | NY | 10019 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (212) 400-4930 | (866) 221-6122 | acohen@kusklaw.com |

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS)

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.**

ARBITRATION PROVISION LOCATION

Gomez Carlos Moises Ortiz DRA.pdf

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.**

## REQUEST FOR HEARING

REQUESTED LOCATION    Per Attached DRA, within 45 miles of 1501 4th Ave. Suite 1900, Seattle, WA, 981

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐    By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|
| NAME (PRINT/TYPED) | Akiva M. Cohen | | |

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | | |
| CITY | Wilmington | STATE | DE | ZIP | 19801 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT·S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94103 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT·S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

 # Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **CARLOS MOISES ORTIZ GOMEZ,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Carlos Moises Ortiz Gomez ("Carlos") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

## I. INTRODUCTION

1. This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2. Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.   The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.   As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.   Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

2

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.  Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.  As detailed below, that worked; Carlos relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12. On January 4, 2023, after the close of the merger, Carlos was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

## II.  ARBITRATION PROVISION

13. This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Carlos signed. A copy of Carlos's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14. There is no arbitration agreement between Carlos and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Carlos's employment with Twitter.

## III.    PARTIES

15. Claimant Carlos Moises Ortiz Gomez is a former Twitter employee residing in Seattle, Washington. While employed at Twitter, Carlos worked at the Seattle, Washington office.

16. Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17. Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18. Respondent X Holdings I is a Delaware corporation.

19. Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.       FACTUAL BACKGROUND

### A. Carlos Was A Dedicated Twitter Employee

21. Carlos is a software engineer and was employed by Twitter as a Senior Test Engineer.

22. Carlos accepted his position with Twitter on or about February 24, 2022, began work on or about March 21, 2022, and remained continuously employed by Twitter until he was laid off on January 4, 2023.

23. Twitter made several promises to Carlos during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Carlos would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B. Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

6

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Carlos in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78.  On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79.  On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80.  It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81.  Carlos did, in fact, rely upon these representations.

82.  The promised severance in fact factored into Carlos's decision to remain at Twitter through the closing of the merger.

83.  To put it simply, Carlos was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84.  Had it not been for the Severance Stability Promise and Twitter's communications about severance, Carlos would have begun the interview process to find a more stable employment situation in mid-May.

85.  Indeed, Carlos received multiple contacts from recruiters between May and October of 2022 asking him to pursue opportunities outside Twitter.

86.  Carlos declined to respond to these requests, in part because he reasonably expected that, should the worst happen, Twitter would live up to its promises to him.

87.  Instead, Carlos chose to remain at Twitter.

### D.  Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement

88.  On October 26, 2022, Musk took over as the owner of Twitter.

89.  On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

90.  On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

91.  On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

92.  In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

93.  In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

94.  Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

95.  On information and belief, this occurred in some cases within hours of the takeover.

96.  On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

97.  Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

98.  On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

99.  On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

100.  The next day, roughly half of Twitter's workforce, including Carlos, were laid off.

101.  The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

102.  Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

103.  But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

104.  These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

105.  In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

106.  He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

14

107.    Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

108.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

109.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

110.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

111.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

112.    And yet again, that still wasn't enough.

113.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

114.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

115.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

116.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

117.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

118.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

119.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

120.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

16

121.     On information and belief, Musk routinely violates agreements as a that would require him to expend money matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

122.     In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

123.     For that reason, Carlos – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

124.     Carlos restates and realleges each paragraph above as if fully stated herein.

125.     Carlos is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

126.     Twitter has breached the Merger Agreement by refusing to pay Carlos the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

127.     X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Carlos the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Carlos *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Carlos will provide in briefing if and as necessary. Carlos raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

128.    As such, Carlos is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B.  Count Two: (against Twitter) Breach of Oral Contract

129.    Carlos restates and realleges each paragraph above as if fully stated herein.

130.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

131.    Carlos accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

132.    Carlos provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on January 4, 2023.

133.    As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Carlos with the severance outlined in the Severance Policy Email, which he fully performed.

134.    Twitter has breached this agreement by refusing to pay Carlos the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Carlos.

135.    As such, Carlos is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### C.  Count Three (in the alternative, against Twitter): Promissory Estoppel

136.    Carlos restates and realleges each paragraph above as if fully stated herein.

137.    To the extent that Twitter's communications and Carlos's subsequent conduct somehow did not create an enforceable contract between Carlos and Twitter, Twitter's

representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

138.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

139.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

140.     It was reasonable for Carlos to rely upon that promise.

141.     Carlos did in fact rely upon that promise.

142.     Carlos was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

143.     Twitter's promise to provide Carlos with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Carlos with such severance.

144.     As such, Carlos is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

145.     Carlos restates and realleges each paragraph above as if fully stated herein.

146.     On or about February 24, 2022, Carlos executed an offer letter from Twitter, which detailed the terms of Carlos's employment (the "Offer Letter").

147.     The Offer Letter constitutes a binding contract between Carlos and Twitter.

148.     The Offer Letter provides that Carlos will be eligible to receive benefits under the terms of Twitter's benefits plans.

19

149.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Carlos was entitled to receive the benefit of when Twitter terminated Carlos.

150.     Twitter did not provide Carlos with severance in accordance with its benefit plan.

151.     As such, Twitter breached the Offer Letter, and Carlos is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

152.     Carlos restates and realleges each paragraph above as if fully stated herein.

153.     In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

154.     Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.     In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

156.     On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

157.     Carlos did rely upon these representations.

158.     On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

159.     Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that

requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

160.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

161.    When it laid off Carlos, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

162.    As a result of Respondents' fraud, Carlos suffered damages.

163.    As such, Carlos is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

164.    In addition, Carlos is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

165.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

166.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Carlos agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

### F.  Count Six: WARN Act Violations

167.    Carlos restates and realleges each paragraph above as if fully stated herein.

168.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

169.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

170.     In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Carlos.

171.     Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Carlos would remain employed but in a 'nonworking' status.

172.     However, Twitter has failed to continue to provide the laid-off employees (including Carlos) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

173.     For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

174.     Twitter also provided other "annually refreshing" benefits to its employees.

175.     Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Carlos, despite those employees continuing to be employed by Twitter on January 1, 2023.

176.     Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

177.     As a result of Twitter's violation of the WARN Act, Carlos is entitled to damages to be proven at hearing, including Carlos's benefits for the "Non-Working Notice period window" to which Carlos was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**G.  Count Seven: Employment Discrimination (42 U.S.C § 2000e,  Cal. Government Code § 12940 et seq., RCW 49.60.030 and 49.60.180(2)**

178.     Carlos restates and realleges each paragraph above as if fully stated herein.

179.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

180.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

181.    In addition, Washington antidiscrimination laws, including RCW 49.60.030 and 49.60.180(2), similarly prohibit discrimination in employment.

182.    Despite those laws, the anecdotal evidence currently available to Carlos indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

183.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

184.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

185.    Compounding these warning signs, Twitter has refused to respond to Carlos's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Carlos to confirm or rebut the picture painted by the available anecdotal information.

186.    Carlos is Hispanic.

187.    On information and belief, Carlos was included in the mass layoff because he is Hispanic.

188.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

189.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Carlos is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**H. Count Eight: Medical Leave Retaliation**

190.     Carlos restates and realleges each paragraph above as if fully stated herein.

191.     Carlos took medical leave to which he was entitled from September 19, 2022 through October 10, 2022, and was working on a reduced schedule due to his medical needs at the time he was informed he would be laid off.

192.     On information and belief, Carlos's use of the medical leave to which he was entitled was a factor in Twitter's decision to lay him off.

193.     Twitter has thus retaliated against Carlos for his use of the medical leave to which he was entitled.

194.     As such, Carlos is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**I.  Count Nine: Violations of the Americans with Disabilities Act and related state statutes.**

195.     Carlos restates and realleges each paragraph above as if fully stated herein.

196.     Carlos suffers from anxiety and depression, and was working with an adjusted schedule due to his medical needs when he was informed he would be laid off.

197.     At the time he was laid off, Carlos's performance was rated on or ahead of track.

198.     On information and belief, Carlos's disability was a factor in Twitter's decision to lay him off.

199.    Twitter has thus violated Carlos's rights under the ADA, and as such is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### J.  Count Ten: Age Discrimination

200.    Carlos restates and realleges each paragraph above as if fully stated herein.

201.    At the time he was laid off, Carlos was over 40 years of age.

202.    At the time he was laid off, Carlos's performance was rated on or ahead of track

203.    On information and belief, Carlos's age was a factor in Twitter's decision to lay him off.

204.    Twitter has thus unlawfully discriminated against Carlos on the basis of age, and as such he is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### K.  Count Eleven (Against Twitter, X Holdings I, and Musk): Wage Theft

205.    Carlos restates and realleges each paragraph above as if fully stated herein.

206.    Under both Washington and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

207.    Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

208.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

209.    Under both California and Washington law, Carlos may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

210.     Twitter's choice to pay Carlos less than the severance guaranteed to him under the Severance Stability Promise was made willfully, with the intent to deprive him of his rightful wages, in violation of RCW 49.52.050(2).

211.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Carlos's unpaid severance, waiting time penalties, and liquidated and exemplary damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### L.   Count Twelve (Against Musk): Piercing the Corporate Veil

212.     Carlos restates and realleges each paragraph above as if fully stated herein.

213.     There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

214.     Musk, through X Holdings I, owns more than 50% of Twitter.

215.     Musk dominates Twitter's decision-making and operations.

216.     For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

217.     Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

218.     Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

219.     At Musk's direction, Twitter restored Anglin's account.

220.     Twitter has engaged in other content moderation decisions at Musk's whims.

221.     For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

222.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

223.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

224.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

225.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

226.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

227.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

228.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

229.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

230.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

231.    As such, Carlos is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI.    REQUEST FOR RELIEF

232.    Wherefore, Carlos Moises Ortiz Gomez respectfully requests that the Arbitrator:

        a.   Award Carlos compensatory damages in an amount to be proven at hearing;

        b.   Award Carlos penalty damages under the WARN Act and federal and state antidiscrimination laws;

        c.   Award Carlos liquidated damages under California and Washington's Wage and Hour Acts;

        d.   Award Carlos waiting time penalties under the California Labor Code;

        e.   Award Carlos punitive damages in the amount of $500,000,000.00;

        f.   Award Carlos costs and attorneys' fees as allowed by statute;

        g.   Award Carlos pre- and post-judgment interest; and

        h.   Award Carlos such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,


          */s/ Akiva M. Cohen*
          Akiva M. Cohen

          KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
          1700 Broadway
          New York, New York 10019
          (212) 400-4930
          acohen@kusklaw.com
          Dylan M. Schmeyer
          dmschmeyer@kusklaw.com
          Michael D. Dunford
          mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before, and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

### 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

### 4. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first-class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

### 5. How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

### 6. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion ofpost-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority toenter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Dalana Brand, Chief People and Diversity Officer
Twitter, Inc.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME

PRINTED                       Carlos Moises Ortiz Gomez

EMPLOYEE SIGNATURE            *Carlos Moises Ortiz Gomez*
                             Carlos Moises Ortiz Gomez (Feb 24, 2022 13:48 PST)

DATE                          Feb 24, 2022

EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 **1-800-352-JAMS**
🖥 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

A. **Demand for Arbitration** *(2 copies)*

B. **Proof of service of the Demand on the appropriate party** *(2 copies)*

C. **Entire contract containing the arbitration clause** *(2 copies)*
   - *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

D. **Administrative Fees**
   - *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

   - *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| RESPONDENT NAME | Twitter, Inc. | | | |
|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | |
| CITY | San Francisco | STATE CA | ZIP 94103 | |
| PHONE | (415) 222-9670 | FAX | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| CLAIMANT NAME | Dawn Hosie | | | |
|---|---|---|---|---|
| ADDRESS | ███████████ | | | |
| CITY | Edmonds | STATE WA | ZIP ████ | |
| PHONE | | FAX | EMAIL | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen | | |
|---|---|---|---|
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. | | |
| ADDRESS | 1700 Broadway, 16th Floor | | |
| CITY | New York | STATE NY | ZIP 10019 |
| PHONE | (212) 400-4930 | FAX (866) 221-6122 | EMAIL acohen@kusklaw.com |

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐  If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.*

**ARBITRATION PROVISION LOCATION**

Hosie Dawn DRA.pdf

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**    Per Attached DRA, within 45 miles of 1501 4th Avenue, Suite 1900, Seattle, WA

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: **Comprehensive Rule 16.1***

☐    By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

    ☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

    ☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

    ☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

 # Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | | |
| CITY | Wilmington | STATE | DE | ZIP | 19801 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/ COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94103 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/ COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

 # Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **DAWN HOSIE,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Dawn Hosie ("Dawn") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I. INTRODUCTION

1. This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2. Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3. Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4. The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5. On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6. As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7. Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8. That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

2

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Dawn relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.   On January 4, 2023, after the close of the merger, Dawn was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

3

## II. ARBITRATION PROVISION

13. This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Dawn signed. A copy of Dawn's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14. There is no arbitration agreement between Dawn and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Dawn's employment with Twitter.

## III. PARTIES

15. Claimant Dawn Hosie is a former Twitter employee residing in Edmonds, Washington. While employed at Twitter, Dawn worked at the Seattle, Washington office, located at 1501 4th Avenue, Suite 1900, Seattle, Washington 98101.

16. Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

and

**[LOCALCOUNSEL ADDRESS]**

17. Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18. Respondent X Holdings I is a Delaware corporation.

19. Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.   FACTUAL BACKGROUND

### A.   Dawn Was a Dedicated Twitter Employee

21. Dawn was employed by Twitter as a Content Production Manager.

22. Dawn accepted her position with Twitter on or about May 12, 2020, began work on or about May 21, 2020, and remained continuously employed by Twitter until she was laid off on January 4, 2023.

23. Twitter made several promises to Dawn during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Dawn would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.   Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

6

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees.**" For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

8

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Dawn in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Dawn did, in fact, rely upon these representations.

82. The promised severance in fact factored into Dawn's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Dawn was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Dawn would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Dawn chose to remain at Twitter.

86. Indeed, Dawn relied on the Severance Stability Promise when she voted her shares in favor of the proposed merger.

**D.  Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

87. On October 26, 2022, Musk took over as the owner of Twitter.

88. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

89. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

90. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

91. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

92. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

93. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

94. On information and belief, this occurred in some cases within hours of the takeover.

95. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

96. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

97. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

98. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

99. The next day, roughly half of Twitter's workforce, including Dawn, were laid off.

100. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

101. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

102. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

103. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

104. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

105. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

106. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

107.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

108.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

109.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

110.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

111.    And yet again, that still wasn't enough.

112.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

113.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

15

114. After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

115. Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

116. The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

117. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

118. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

119. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

120. On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

16

121.     In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

122.     For that reason, Dawn – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

123.     Dawn restates and realleges each paragraph above as if fully stated herein.

124.     Dawn is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

125.     Twitter has breached the Merger Agreement by refusing to pay Dawn the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.     X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Dawn the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged."

127.     As such, Dawn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Dawn *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Dawn will provide in briefing if and as necessary. Dawn raises the issue here as part of her duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

### B.  Count Two (against Twitter): Breach of Oral Contract

128.    Dawn restates and realleges each paragraph above as if fully stated herein.

129.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

130.    Dawn accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

131.    Dawn provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2023.

132.    As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Dawn with the severance outlined in the Severance Policy Email, which she fully performed.

133.    Twitter has breached this agreement by refusing to pay Dawn the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Dawn.

134.    As such, Dawn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### C.  Count Three (in the alternative, against Twitter): Promissory Estoppel

135.    Dawn restates and realleges each paragraph above as if fully stated herein.

136.    To the extent that Twitter's communications and Dawn's subsequent conduct somehow did not create an enforceable contract between Dawn and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

137.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

138.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

139.     It was reasonable for Dawn to rely upon that promise.

140.     Dawn did in fact rely upon that promise.

141.     Dawn was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

142.     Twitter's promise to provide Dawn with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Dawn with such severance.

143.     As such, Dawn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

144.     Dawn restates and realleges each paragraph above as if fully stated herein.

145.     On or about May 12, 2020, Dawn executed an offer letter from Twitter, which detailed the terms of Dawn's employment (the "Offer Letter").

146.     The Offer Letter constitutes a binding contract between Dawn and Twitter.

147.     The Offer Letter provides that Dawn will be eligible to receive benefits under the terms of Twitter's benefits plans.

148.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Dawn was entitled to receive the benefit of when Twitter terminated Dawn.

19

149. Twitter did not provide Dawn with severance in accordance with its benefit plan.

150. As such, Twitter breached the Offer Letter, and Dawn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

E. Count Five (against all Respondents): Fraud

151. Dawn restates and realleges each paragraph above as if fully stated herein.

152. In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

153. Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

154. In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

155. On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

156. Dawn did rely upon these representations.

157. On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

158. Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

159.     On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

160.     When it laid off Dawn, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

161.     As a result of Respondents' fraud, Dawn suffered damages.

162.     As such, Dawn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

163.     In addition, Dawn is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

164.     On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

165.     In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Dawn agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations (29 U.S.C.A. § 2101 et seq.)**

166.     Dawn restates and realleges each paragraph above as if fully stated herein.

167.     The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

168.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

169.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Dawn.

170.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Dawn would remain employed but in a 'nonworking' status.

171.    However, Twitter has failed to continue to provide the laid-off employees (including Dawn) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

172.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

173.    Twitter also provided other "annually refreshing" benefits to its employees.

174.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Dawn, despite those employees continuing to be employed by Twitter on January 1, 2023.

175.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

176.    As a result of Twitter's violation of the WARN Act, Dawn is entitled to damages to be proven at hearing, including Dawn's benefits for the "Non-Working Notice period window" to which Dawn was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven Employment Discrimination

177.    Dawn restates and realleges each paragraph above as if fully stated herein.

178.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

179.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

180.    In addition, Washington antidiscrimination laws, including RCW 49.60.030 and 49.60.180(2), similarly prohibit discrimination in employment.

181.    Despite those laws, the anecdotal evidence currently available to Dawn indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

182.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

183.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

184.    Compounding these warning signs, Twitter has refused to respond to Dawn's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Dawn to confirm or rebut the picture painted by the available anecdotal information.

185.    Dawn is a woman.

186.    Dawn is transgender.

187.    Dawn is a lesbian.

188.    On information and belief, Dawn was included in the mass layoff because she is a transgender woman and a lesbian.

189.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

190.    As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Dawn is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

### H. Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft (Cal. Labor Code § 201-203, RCW 49.52.050(2))

191.    Dawn restates and realleges each paragraph above as if fully stated herein.

192.    Under both Washington and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

193.    Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

194.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

195.    Under Washington law, an employer who willfully pays less than all wages due by the statutory deadline is liable for both compensatory damages and double exemplary damages, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

196.    Twitter's choice to pay Dawn less than the severance guaranteed to her under the Severance Stability Promise was made willfully, with the intent to deprive her of her rightful wages, in violation of. RCW 49.52.050(2)

197.    Under both Washington and California law, Dawn may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

198.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Dawn's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## I.  Count Ten (Against Musk): Piercing the Corporate Veil

199.    Dawn restates and realleges each paragraph above as if fully stated herein.

200.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

201.    Musk, through X Holdings I, owns more than 50% of Twitter.

202.    Musk dominates Twitter's decision-making and operations.

203.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

204.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

205.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

206.    At Musk's direction, Twitter restored Anglin's account.

207.    Twitter has engaged in other content moderation decisions at Musk's whims.

208.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

209.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

210.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

211.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

212.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

213.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

214.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

215.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

216.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

217.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

218.    As such, Dawn is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI.    REQUEST FOR RELIEF

219.    Wherefore, Dawn Hosie respectfully requests that the Arbitrator:

    a.    Award Dawn compensatory damages in an amount to be proven at hearing;

    b.    Award Dawn penalty damages under the WARN Act and state and federal antidiscrimination laws;

    c.    Award Dawn liquidated and exemplary damages under California and Washington law;

    d.    Award Dawn waiting time penalties under California and Washington law;

e.   Award Dawn waiting time penalties under the California Labor Code;

f.   Award Dawn punitive damages in the amount of $500,000,000.00;

g.   Award Dawn costs and attorneys' fees as allowed by statute;

h.   Award Dawn pre- and post-judgment interest; and

i.   Award Dawn such other and further relief as the Arbitrator deems

    appropriate.

Respectfully Submitted,


        */s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.





## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/**.** Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

 

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED    Dawn Hosie

EMPLOYEE SIGNATURE    Dawn Hosie (May 12, 2020)

Date:    May 12, 2020





EXHIBIT H

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS



## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

☏ **1-800-352-JAMS**

▣ **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| RESPONDENT NAME | Twitter, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94103 |
| PHONE | (415) 222-9670 | FAX | | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7.**

| CLAIMANT NAME | Wayne Krug | | | | |
|---|---|---|---|---|---|
| ADDRESS | ███████████ | | | | |
| CITY | Bloomfield | STATE | NJ | ZIP | ████ |
| PHONE | | FAX | | EMAIL | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. | | | | |
| ADDRESS | 1700 Broadway, 16th Floor | | | | |
| CITY | New York | STATE | NY | ZIP | 10019 |
| PHONE | (212) 400-4930 | FAX | (866) 221-6122 | EMAIL | acohen@kusklaw.com |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. ***Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.***

**ARBITRATION PROVISION LOCATION**

Krug Wayne DRA.pdf (Attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. ***Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.***

## REQUEST FOR HEARING

**REQUESTED LOCATION**    Per Attached DRA, within 45 miles of 245 W 17th St, New York, NY 10011

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

See: ***Comprehensive Rule 16.1***

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.  The contract is with a consumer party, as defined in these standards;
2.  The contract was drafted by or on behalf of the non-consumer party; and
3.  The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.  An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.  An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.  An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.  An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | | |
| CITY | Wilmington | STATE | DE | ZIP | 19801 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94103 |
| PHONE | | FAX | | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **WAYNE KRUG,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Wayne Krug ("Wayne") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I. INTRODUCTION

1. This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2. Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3. Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.    That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Wayne relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12.   On February 2, 2023, after the close of the merger, Wayne was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Wayne signed. A copy of Wayne's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Wayne and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Wayne's employment with Twitter.

## III.   PARTIES

15.  Claimant Wayne Krug is a former Twitter employee residing in Bloomfield, New Jersey. While employed at Twitter, Wayne worked at Twitter's New York City office, located at 249 West 17th Street, New York, NY.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

IV.   **FACTUAL BACKGROUND**

A.   **Wayne Was A Dedicated Twitter Employee**

21. Wayne was employed by Twitter as a Sr. ML Engineer.

22. Wayne accepted his position with Twitter on or about December 27, 2018, began work on or about January 14, 2019, and remained continuously employed by Twitter until he was laid off on February 2, 2023.

23. Twitter made several promises to Wayne during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Wayne would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

B.   **Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered**

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

6

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C.  Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees.**" For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

8

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Wayne in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

10

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Wayne did, in fact, rely upon these representations.

82. The promised severance in fact factored into Wayne's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Wayne was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Wayne would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Wayne chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, **including** Wayne, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.    For that reason, Wayne – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.    Wayne restates and realleges each paragraph above as if fully stated herein.

123.    Wayne is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.    Twitter has breached the Merger Agreement by refusing to pay Wayne the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Wayne the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged."

126.    As such, Wayne is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Wayne *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Wayne will provide in briefing if and as necessary. Wayne raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

127.    Wayne restates and realleges each paragraph above as if fully stated herein.

128.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.    Wayne accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.    Wayne provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on February 2, 2023.

131.    As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Wayne with the severance outlined in the Severance Policy Email, which he fully performed.

132.    Twitter has breached this agreement by refusing to pay Wayne the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Wayne.

133.    As such, Wayne is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.    Wayne restates and realleges each paragraph above as if fully stated herein.

135.    To the extent that Twitter's communications and Wayne's subsequent conduct somehow did not create an enforceable contract between Wayne and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.     It was reasonable for Wayne to rely upon that promise.

139.     Wayne did in fact rely upon that promise.

140.     Wayne was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

141.     Twitter's promise to provide Wayne with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Wayne with such severance.

142.     As such, Wayne is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

143.     Wayne restates and realleges each paragraph above as if fully stated herein.

144.     On or about December 27, 2018, Wayne executed an offer letter from Twitter, which detailed the terms of Wayne's employment (the "Offer Letter").

145.     The Offer Letter constitutes a binding contract between Wayne and Twitter.

146.     The Offer Letter provides that Wayne will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Wayne was entitled to receive the benefit of when Twitter terminated Wayne.

19

148.    Twitter did not provide Wayne with severance in accordance with its benefit plan.

149.    As such, Twitter breached the Offer Letter, and Wayne is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.    Wayne restates and realleges each paragraph above as if fully stated herein.

151.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.    Wayne did rely upon these representations.

156.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.    When it laid off Wayne, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.    As a result of Respondents' fraud, Wayne suffered damages.

161.    As such, Wayne is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.    In addition, Wayne is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Wayne agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations (29 U.S.C.A. § 2101 et seq. and New York Labor Law Article 25-A et seq.)**

165.    Wayne restates and realleges each paragraph above as if fully stated herein.

166.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff, while the New York State WARN Act, New York Labor Law Article 25-A et seq ("New York WARN Act") while the New York WARN Act requires 90 days' notice.

167.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act and the New York WARN Act.

168.     In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Wayne.

169.     Instead, Twitter designated the period from November 4, 2022 through February 2, 2023 as a period during which Wayne would remain employed but in a 'nonworking' status.

170.     However, Twitter has failed to continue to provide the laid-off employees (including Wayne) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act and the New York WARN Act.

171.     For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.     Twitter also provided other "annually refreshing" benefits to its employees.

173.     Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Wayne, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.     Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.     As a result of Twitter's violation of the WARN Act and New York WARN Act, Wayne is entitled to damages to be proven at hearing, including Wayne's benefits for the "Non-Working Notice period window" to which Wayne was entitled, statutory WARN Act and New York WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Employment Discrimination

176.    Wayne restates and realleges each paragraph above as if fully stated herein.

177.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

178.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

179.    In addition, New York Human Rights Law prohibits employment discrimination at the state level.

180.    Despite those laws, the anecdotal evidence currently available to Wayne indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

181.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

182.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

183.    Compounding these warning signs, Twitter has refused to respond to Wayne's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Wayne to confirm or rebut the picture painted by the available anecdotal information.

184.    On information and belief, the entire layoff was conducted in a discriminatory manner.

185.    On information and belief, Wayne was included in the mass layoff to reduce the chances that the layoff as a whole would be seen as the product of a discriminatory process.

186.    Wayne is an older employee.

23

187.     On information and belief, Wayne was included in the mass layoff because he is an older employee.

188.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

189.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Wayne is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**H. Count Eight: Age Discrimination**

190.     Wayne restates and realleges each paragraph above as if fully stated herein.

191.     At the time he was laid off, Wayne was over 40 years of age.

192.     At the time he was laid off, Wayne's performance was rated on- or ahead-of-track.

193.     On information and belief, Wayne's age was a factor in Twitter's decision to lay him off.

194.     Twitter has thus unlawfully discriminated against Wayne on the basis of age, and as such he is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**I.  Count Nine (Against Twitter, X Holdings I, and Musk): Wage Theft**

195.     Wayne restates and realleges each paragraph above as if fully stated herein.

196.     Under both New York and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

197.     Under New York and California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

198.     Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

199.     Under New York law, engaging in such wage theft triggers a liquidated damages penalty of up to 100% of the total amount of the wages determined to be due.

200.     Under California law, the definition of "employer" against whom Wayne may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

201.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Wayne's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**J.     Count Ten (Against Musk): Piercing the Corporate Veil**

202.     Wayne restates and realleges each paragraph above as if fully stated herein.

203.     There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

204.     Musk, through X Holdings I, owns more than 50% of Twitter.

205.     Musk dominates Twitter's decision-making and operations.

206.     For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

207.     Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

208.     Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

209.     At Musk's direction, Twitter restored Anglin's account.

210.     Twitter has engaged in other content moderation decisions at Musk's whims.

211.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

212.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

213.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

214.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

215.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

216.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

217.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

218.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

219.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

220.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

221.    As such, Wayne is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

**VI.    REQUEST FOR RELIEF**

222.    Wherefore, Wayne Krug respectfully requests that the Arbitrator:

    a.   Award Wayne compensatory damages in an amount to be proven at hearing;

    b.   Award Wayne penalty damages under the WARN Act and New York WARN Act, and California, New York and federal antidiscrimination laws;

    c.   Award Wayne liquidated damages under California Labor Code and New York Labor Law;

    d.   Award Wayne waiting time penalties under the California Labor Code;

    e.   Award Wayne punitive damages in the amount of $500,000,000.00;

    f.   Award Wayne costs and attorneys' fees as allowed by statute;

    g.   Award Wayne pre- and post-judgment interest; and

    h.   Award Wayne such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,


     /s/ Akiva M. Cohen
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.



*WK*

1

## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

 

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED     *Wayne Krug*
Wayne Krug (Dec 27, 2018)

EMPLOYEE SIGNATURE     Wayne Krug

Date:     Dec 27, 2018



WK     3

EXHIBIT I

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS


📞 1-800-352-JAMS
🖥 www.jamsadr.com

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| | | | | |
|---|---|---|---|---|
| **RESPONDENT NAME** | Twitter, Inc. | | | |
| **ADDRESS** | 1355 Market St #900 | | | |
| **CITY** | San Francisco | **STATE** CA | **ZIP** 94103 | |
| **PHONE** | (415) 222-9670 | **FAX** | **EMAIL** | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | | | | |
|---|---|---|---|---|
| **REPRESENTATIVE/ATTORNEY** | Brian D. Berry | | | |
| **FIRM/COMPANY** | Morgan, Lewis & Bockius LLP | | | |
| **ADDRESS** | One Market, Spear Street Tower | | | |
| **CITY** | San Francisco | **STATE** CA | **ZIP** 94105 | |
| **PHONE** | (415) 442-1000 | **FAX** (415) 442-1001 | **EMAIL** brian.berry@morganlewis.com | |

## FROM CLAIMANT

Add more claimants on **page 7.**

| | | | | |
|---|---|---|---|---|
| **CLAIMANT NAME** | Laurent Luce | | | |
| **ADDRESS** | ███████ | | | |
| **CITY** | Belmont | **STATE** | **ZIP** ███ | |
| **PHONE** | | **FAX** | **EMAIL** | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | | | | |
|---|---|---|---|---|
| **REPRESENTATIVE/ATTORNEY** | Akiva M. Cohen | | | |
| **FIRM/COMPANY** | Kamerman, Uncyk, Soniker & Klein, P.C. | | | |
| **ADDRESS** | 1700 Broadway, 16th Floor | | | |
| **CITY** | New York | **STATE** NY | **ZIP** 10019 | |
| **PHONE** | (212) 400-4930 | **FAX** (866) 221-6122 | **EMAIL** acohen@kusklaw.com | |

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐  If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.*

**ARBITRATION PROVISION LOCATION**

Luce Laurent DRA.pdf (attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**  Per Attached DRA, within 45 miles of 1355 Market St #900, San Francisco, CA 9

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: **Comprehensive Rule 16.1***

☐  By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

**SIGNATURE**  /s/ Akiva M. Cohen     **DATE**  February 24, 2023

**NAME (PRINT/TYPED)**  Akiva M. Cohen

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

[✓]   <u>YES</u>, this **is** a CONSUMER ARBITRATION.

[ ]   <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.   The contract is with a consumer party, as defined in these standards;
2.   The contract was drafted by or on behalf of the non-consumer party; and
3.   The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.   An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.   An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.   An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.   An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

[ ] Less than $100,000     [ ] $100,000 to $250,000     [ ] More than $250,000     [✓] Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | |
|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | |

| CITY | Wilmington | STATE | DE | ZIP | 19801 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | |
|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | |

| CITY | San Francisco | STATE | CA | ZIP | 94103 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **LAURENT LUCE,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

### CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Laurent Luce ("Laurent") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.  This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.  Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.  Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.   The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.   As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.   Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.     Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Laurent relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12.   On January 4, 2023, after the close of the merger, Laurent was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

3

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Laurent signed. A copy of Laurent's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Laurent and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Laurent's employment with Twitter.

## III.     PARTIES

15.  Claimant Laurent Luce is a former Twitter employee residing in Belmont, Massachusetts. While employed at Twitter, Laurent worked from his home, located at Belmont, Massachusetts, and reported to a manager located at Twitter's San Francisco, California office, from which his work was assigned.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

4

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.  FACTUAL BACKGROUND

### A.  Laurent Was A Dedicated Twitter Employee

21. Laurent was employed by Twitter as Sr. Software Engineer, reporting directly to David Rahn.

22. Laurent accepted his position with Twitter on or about February 17, 2021, began work on or about March 22, 2021, and remained continuously employed by Twitter until he was laid off on January 4, 2023.

23. Twitter made several promises to Laurent during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Laurent would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

5

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

8

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Laurent in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

  o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

  o Pro-rated Performance Bonus Plan compensation at target

  o Cash value of equity that would have vested within three months from the separation date

  o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Laurent did, in fact, rely upon these representations.

82. The promised severance in fact factored into Laurent's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Laurent was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Laurent would have begun the interview process to find a more stable employment situation in May.

85. Instead, **Laurent** chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

12

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Laurent, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.    And yet again, that still wasn't enough.

111.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

15

113.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.    For that reason, Laurent – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.    Laurent restates and realleges each paragraph above as if fully stated herein.

123.    Laurent is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.    Twitter has breached the Merger Agreement by refusing to pay Laurent the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Laurent the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Laurent *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Laurent will provide in briefing if and as necessary. Laurent raises the issue here as part of **his** duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

126.     As such, Laurent is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B.  Count Two: (against Twitter) Breach of Oral Contract

127.     Laurent restates and realleges each paragraph above as if fully stated herein.

128.     The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.     Laurent accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.     Laurent provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on January 4, 2023.

131.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Laurent with the severance outlined in the Severance Policy Email, which he fully performed.

132.     Twitter has breached this agreement by refusing to pay Laurent the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Laurent.

133.     As such, Laurent is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### C.  Count Three (in the alternative, against Twitter): Promissory Estoppel

134.     Laurent restates and realleges each paragraph above as if fully stated herein.

135.     To the extent that Twitter's communications and Laurent's subsequent conduct somehow did not create an enforceable contract between Laurent and Twitter, Twitter's

representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.     It was reasonable for Laurent to rely upon that promise.

139.     Laurent did in fact rely upon that promise.

140.     Laurent was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

141.     Twitter's promise to provide Laurent with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Laurent with such severance.

142.     As such, Laurent is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

143.     Laurent restates and realleges each paragraph above as if fully stated herein.

144.     On or about February 17, 2021, Laurent executed an offer letter from Twitter, which detailed the terms of Laurent's employment (the "Offer Letter").

145.     The Offer Letter constitutes a binding contract between Laurent and Twitter.

146.     The Offer Letter provides that Laurent will be eligible to receive benefits under the terms of Twitter's benefits plans.

19

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Laurent was entitled to receive the benefit of when Twitter terminated Laurent.

148.     Twitter did not provide Laurent with severance in accordance with its benefit plan.

149.     As such, Twitter breached the Offer Letter, and Laurent is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.     Laurent restates and realleges each paragraph above as if fully stated herein.

151.     In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.     Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.     In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.     On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.     Laurent did rely upon these representations.

156.     On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.     Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that

requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158. On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159. When it laid off Laurent, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160. As a result of Respondents' fraud, Laurent suffered damages.

161. As such, Laurent is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162. In addition, Laurent is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163. On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164. In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Laurent agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F. Count Six: WARN Act Violations**

165. Laurent restates and realleges each paragraph above as if fully stated herein.

166. The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Laurent.

169.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Laurent would remain employed but in a 'nonworking' status.

170.    However, Twitter has failed to continue to provide the laid-off employees (including Laurent) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.    Twitter also provided other "annually refreshing" benefits to its employees.

173.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Laurent, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.    As a result of Twitter's violation of the WARN Act, Laurent is entitled to damages to be proven at hearing, including Laurent's benefits for the "Non-Working Notice period window" to which Laurent was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

22

### G.  Count Seven: California WARN Act Violations (Cal.Labor Code § 1400 et seq.)

176.    Laurent is a remote worker, and thus, for State and Federal WARN Act purposes, his single site of employment is the Twitter office to which he was assigned.

177.    Under that standard Laurent's single site of employment is Twitter's San Francisco, California office.

178.    The California WARN Act, Cal.Labor Code § 1400 et seq. ("California WARN Act") required Twitter to provide Laurent with 60 days' notice before it could terminate him and pay him all of his benefits during that time, which Twitter failed to pay.

179.    As a result of Twitter's violation of the California WARN Act, Laurent is entitled to damages to be proven at hearing, including Laurent's benefits for the 60 days' notice to which Laurent was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### H.  Count Eight: Employment Discrimination (42 U.S.C § 2000e, Cal. Government Code § 12940 et seq., and MGL 151B, Section 4)

180.    Laurent restates and realleges each paragraph above as if fully stated herein.

181.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

182.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

183.    In addition, Massachusetts law prohibits employment discrimination.

184.    Despite those laws, the anecdotal evidence currently available to Laurent indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

185.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

186.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

187.     Compounding these warning signs, Twitter has refused to respond to Laurent's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Laurent to confirm or rebut the picture painted by the available anecdotal information.

188.     Laurent is an older employee.

189.     Laurent is a cisgender, straight white male.

190.     On information and belief, Laurent was included in the mass layoff because he is an older employee.

191.     Moreover, to the extent that Twitter's mass layoff deliberately targeted LGBT employees and employees of color, upon information and belief Laurent's inclusion in the layoff was designed to camouflage that discrimination, and therefore was based on his status as a straight white male.

192.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

193.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Laurent is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

### I.     Count Nine (Against Twitter, X Holdings I, and Musk): Wage Theft (Cal. Labor Code § 201-203)

194.     Laurent restates and realleges each paragraph above as if fully stated herein.

195.     Under California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

196.     Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

197.     Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

198.     Under Massachusetts law, such wage theft triggers a mandatory penalty of three-times the amount of the withheld wages as liquidated damages.

199.     Under California law, the definition of "employer" against whom Laurent may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

200.     Under Massachusetts law, the definition of "employer" against whom Laurent may bring claims for wage theft includes not only Twitter, but Musk as an individual.

201.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Laurent's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**J.   Count Ten (Against Musk): Piercing the Corporate Veil**

202.     Laurent restates and realleges each paragraph above as if fully stated herein.

203.     There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

204.     Musk, through X Holdings I, owns more than 50% of Twitter.

205.     Musk dominates Twitter's decision-making and operations.

206.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

207.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

208.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

209.    At Musk's direction, Twitter restored Anglin's account.

210.    Twitter has engaged in other content moderation decisions at Musk's whims.

211.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

212.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

213.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

214.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

215.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

216.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

217.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

218.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

219.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

220.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

221.    As such, Laurent is entitled to an award holding Musk personally liable for any amounts awarded on his other claims.

## VI.    REQUEST FOR RELIEF

222.    Wherefore, Laurent Luce respectfully requests that the Arbitrator:

   a.   Award Laurent compensatory damages in an amount to be proven at hearing;

   b.   Award Laurent penalty damages under the WARN Act and California WARN Act, California, Massachusetts, and federal antidiscrimination laws;

   c.   Award Laurent liquidated damages under California Wage and Hour Act and Massachusetts law;

   d.   Award Laurent waiting time penalties under the California Labor Code;

   e.   Award Laurent punitive damages in the amount of $500,000,000.00;

   f.   Award Laurent costs and attorneys' fees as allowed by statute;

   g.   Award Laurent pre- and post-judgment interest; and

      h.  Award Laurent such other and further relief as the Arbitrator deems

appropriate.

Respectfully Submitted,


          */s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

28

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1.  How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2.  Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

rev.NOV2018





1

## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law are forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED     Laurent Luce

EMPLOYEE SIGNATURE        *Laurent Luce*
                          Laurent Luce (Feb 17, 2021 10:57 EST)

Date:                     Feb 17, 2021



EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

 1-800-352-JAMS
www.jamsadr.com

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| | |
|---|---|
| RESPONDENT NAME | Twitter, Inc. |
| ADDRESS | 1355 Market St #900 |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| San Francisco | | CA | | 94103 | |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 222-9670 | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| San Francisco | | CA | | 94105 | |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 442-1000 | (415) 442-1001 | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7.**

| | |
|---|---|
| CLAIMANT NAME | Patrick O'Connell |
| ADDRESS | ▮▮▮▮▮▮▮ |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| Madison | | WI | | ▮▮▮▮ | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen |
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. |
| ADDRESS | 1700 Broadway, 16th Floor |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| New York | | NY | | 10019 | |

| PHONE | FAX | EMAIL |
|---|---|---|
| (212) 400-4930 | (866) 221-6122 | acohen@kusklaw.com |

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach* <u>*two copies*</u> *of entire agreement.*

**ARBITRATION PROVISION LOCATION**

O'Connell Patrick DRA.pdf

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with* <u>*two copies*</u> *to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   Per Attached DRA, within 45 miles of ████████ Madison, WI ████

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | X Holdings I, Inc. |
| ADDRESS | 1209 ORANGE ST |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| Wilmington | | DE | | 19801 | |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | | | | | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| San Francisco | | CA | | 94105 | |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| (415) 442-1000 | | (415) 442-1001 | | brian.berry@morganlewis.com | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | Elon Musk |
| ADDRESS | 1355 Market St #900 |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| San Francisco | | CA | | 94103 | |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | | | | | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| San Francisco | | CA | | 94105 | |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| (415) 442-1000 | | (415) 442-1001 | | brian.berry@morganlewis.com | |



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| | |
|---|---|
| CLAIMANT NAME | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

## CLAIMANT #3

| | |
|---|---|
| CLAIMANT NAME | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| CITY | STATE | ZIP |
|---|---|---|
| | | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

CAUSE NO. _____

| | |
|---|---|
| PATRICK O'CONNELL, | |
| CLAIMANT, | |
| V. | JAMS |
| TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK, | |
| RESPONDENTS. | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Patrick O'Connell ("Patrick") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.   The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.   As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.   Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Patrick relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12.   On January 4, 2022, after the close of the merger, Patrick was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

3

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Patrick signed. A copy of Patrick's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Patrick and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Patrick's employment with Twitter.

### III.    PARTIES

15.  Claimant Patrick O'Connell is a former Twitter employee residing in Madison, Wisconsin. While employed at Twitter, Patrick worked from his home, located at ███████████, Madison, Wisconsin ████, his work was assigned from the Boulder, Colorado office, and he reported to a manager located at the San Francisco, California office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.    FACTUAL BACKGROUND

### A.  Patrick Was A Dedicated Twitter Employee

21. Patrick is a Security Engineer and was employed by Twitter as a Security Engineer,  and reported to Luiz Carlos Mendes de Mello.

22. Patrick accepted his position with Twitter on or about March 23, 2022, began work on or about April 18, 2022, and remained continuously employed by Twitter until he was laid off on January 4, 2023.

23. Twitter made several promises to Patrick during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Patrick would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

6

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Patrick in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

10

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Patrick did, in fact, rely upon these representations.

82. The promised severance in fact factored into Patrick's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Patrick was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Patrick would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Patrick chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

12

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Patrick, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

15

113.     After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.     Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.     The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.     All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.     The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.     Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.     On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.    For that reason, Patrick – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.    Patrick restates and realleges each paragraph above as if fully stated herein.

123.    Patrick is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.    Twitter has breached the Merger Agreement by refusing to pay Patrick the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Patrick the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.    As such, Patrick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Patrick *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Patrick will provide in briefing if and as necessary. Patrick raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

127.    Patrick restates and realleges each paragraph above as if fully stated herein.

128.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.    Patrick accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.    Patrick provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on January 4, 2023.

131.    As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Patrick with the severance outlined in the Severance Policy Email, which he fully performed.

132.    Twitter has breached this agreement by refusing to pay Patrick the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Patrick.

133.    As such, Patrick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.    Patrick restates and realleges each paragraph above as if fully stated herein.

135.    To the extent that Twitter's communications and Patrick's subsequent conduct somehow did not create an enforceable contract between Patrick and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.     It was reasonable for Patrick to rely upon that promise.

139.     Patrick did in fact rely upon that promise.

140.     Patrick was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

141.     Twitter's promise to provide Patrick with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Patrick with such severance.

142.     As such, Patrick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

143.     Patrick restates and realleges each paragraph above as if fully stated herein.

144.     On or about March 23, 2022, Patrick executed an offer letter from Twitter, which detailed the terms of Patrick's employment (the "Offer Letter").

145.     The Offer Letter constitutes a binding contract between Patrick and Twitter.

146.     The Offer Letter provides that Patrick will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Patrick was entitled to receive the benefit of when Twitter terminated Patrick.

19

148.   Twitter did not provide Patrick with severance in accordance with its benefit plan.

149.   As such, Twitter breached the Offer Letter, and Patrick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.   Count Five (against all Respondents): Fraud**

150.   Patrick restates and realleges each paragraph above as if fully stated herein.

151.   In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.   Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.   In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.   On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.   Patrick did rely upon these representations.

156.   On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.   Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

20

158.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.    When it laid off Patrick, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.    As a result of Respondents' fraud, Patrick suffered damages.

161.    As such, Patrick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.    In addition, Patrick is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Patrick agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations**

165.    Patrick restates and realleges each paragraph above as if fully stated herein.

166.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.     In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Patrick.

169.     Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Patrick would remain employed but in a 'nonworking' status.

170.     However, Twitter has failed to continue to provide the laid-off employees (including Patrick) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.     For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.     Twitter also provided other "annually refreshing" benefits to its employees.

173.     Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Patrick, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.     Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.     As a result of Twitter's violation of the WARN Act, Patrick is entitled to damages to be proven at hearing, including Patrick's benefits for the "Non-Working Notice period window" to which Patrick was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Count Seven: Employment Discrimination

176.     Patrick restates and realleges each paragraph above as if fully stated herein.

177.     Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

178.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

179.    In addition, the Wisconsin Fair Employment Law similarly bars discrimination in employment.

180.    Despite those laws, the anecdotal evidence currently available to Patrick indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

181.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

182.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

183.    Compounding these warning signs, Twitter has refused to respond to Patrick's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Patrick to confirm or rebut the picture painted by the available anecdotal information.

184.    Patrick is queer.

185.    Patrick is a bipolar type 2 individual.

186.    On information and belief, Patrick was included in the mass layoff because he is queer, is a bipolar type 2 individual and because he suffers from type 1 diabetes.

187.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

188.    As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Patrick is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**H.  Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft**

189.    Patrick restates and realleges each paragraph above as if fully stated herein.

190.    Under both Wisconsin and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

191.    Under both California and Wisconsin law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages based on the amount of any stolen wages.

192.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

193.    Under both California law, the definition of "employer" against whom Patrick may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

194.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Patrick's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**I.  Count Nine (Against Musk): Piercing the Corporate Veil**

195.    Patrick restates and realleges each paragraph above as if fully stated herein.

196.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

197.    Musk, through X Holdings I, owns more than 50% of Twitter.

198.    Musk dominates Twitter's decision-making and operations.

199.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

200.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

201.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

202.    At Musk's direction, Twitter restored Anglin's account.

203.    Twitter has engaged in other content moderation decisions at Musk's whims.

204.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

205.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

206.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

207.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

208.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

209.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

210.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

211.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

212.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

213.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

214.    As such, Patrick is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

**VI.    REQUEST FOR RELIEF**

215.    Wherefore, Patrick O'Connell respectfully requests that the Arbitrator:

    a.    Award Patrick compensatory damages in an amount to be proven at hearing;

    b.    Award Patrick penalty damages under the WARN Act and federal and state antidiscrimination laws;

    c.    Award Patrick waiting time and other penalties under the California Labor Code and Wisconsin law;

    d.    Award Patrick punitive damages in the amount of $500,000,000.00;

    e.    Award Patrick costs and attorneys' fees as allowed by statute;

    f.    Award Patrick pre- and post-judgment interest; and

    g.    Award Patrick such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

*/s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

27

## DISPUTE RESOLUTION AGREEMENT

This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.

You can choose to opt out of this Agreement – you have 30 days to opt out.

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before, and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first-class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5. How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

## 7. The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9. Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Dalana Brand, Chief People and Diversity Officer
Twitter, Inc.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME

PRINTED          Patrick O'Connell

EMPLOYEE SIGNATURE    *Patrick O'Connell*
                      Patrick O'Connell (Mar 23, 2022 09:20 CDT)

DATE            Mar 23, 2022

EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

 1-800-352-JAMS
www.jamsadr.com

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Twitter, Inc. |
| **ADDRESS** | 1355 Market St #900 |

| CITY | San Francisco | STATE | CA | ZIP | 94103 |
|---|---|---|---|---|---|

| PHONE | (415) 222-9670 | FAX | | EMAIL | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Brian D. Berry |
| **FIRM/COMPANY** | Morgan, Lewis & Bockius LLP |
| **ADDRESS** | One Market, Spear Street Tower |

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Jennifer Ryan |
| **ADDRESS** | ███████████ |

| CITY | Golden | STATE | CO | ZIP | ████ |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Akiva M. Cohen |
| **FIRM/COMPANY** | Kamerman, Uncyk, Soniker & Klein, P.C. |
| **ADDRESS** | 1700 Broadway, 16th Floor |

| CITY | New York | STATE | NY | ZIP | 10019 |
|---|---|---|---|---|---|

| PHONE | (212) 400-4930 | FAX | (866) 221-6122 | EMAIL | acohen@kusklaw.com |
|---|---|---|---|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.**

ARBITRATION PROVISION LOCATION

Ryan Jennifer DRA.pdf (attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION   Per Attached DRA, within 45 miles of 1301 Walnut St, Boulder, CO 80302

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.   The contract is with a consumer party, as defined in these standards;
2.   The contract was drafted by or on behalf of the non-consumer party; and
3.   The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.   An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.   An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.   An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.   An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. |
|---|---|

| ADDRESS | 1209 ORANGE ST |
|---|---|

| CITY | Wilmington | STATE | DE | ZIP | 19801 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk |
|---|---|

| ADDRESS | 1355 Market St #900 |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94103 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

 # Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **JENNIFER RYAN,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Jennifer Ryan ("Jen") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.  This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.  Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.  Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.    That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.  Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.  As detailed below, that worked; Jen relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.  On January 4, 2023, after the close of the merger, Jen was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Jen signed. A copy of Jen's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Jen and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Jen's employment with Twitter.

## III.        PARTIES

15.  Claimant Jennifer Ryan is a former Twitter employee residing in Colorado. While employed at Twitter, Jen worked at from her home, and reported to the Boulder, CO office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20.  On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis &

4

Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.        FACTUAL BACKGROUND

### A.  Jen Was A Dedicated Twitter Employee

21. Jen is a software engineer, and was employed by Twitter as Senior Software Engineer.

22. Jen accepted her position with Twitter on or about May 28th, 2021, began work on or about August 16, 2021, and remained continuously employed by Twitter until she was laid off on January 4, 2023.

23. Twitter made several promises to Jen during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Jen would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

5

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

8

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Jen in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

  o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

  o Pro-rated Performance Bonus Plan compensation at target

  o Cash value of equity that would have vested within three months from the separation date

  o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Jen did, in fact, rely upon these representations.

82. The promised severance in fact factored into Jen's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Jen was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Jen would have accepted another job in August, when she received an offer from another firm.

85. Instead, Jen chose to remain at Twitter, relying on Twitter's promise of severance if she was laid off following the merger.

### D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Jen, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100.  Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101.  But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102.  These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103.  In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104.  He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105.  Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113. After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114. Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115. The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119. On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.    For that reason, Jen – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.    Jen restates and realleges each paragraph above as if fully stated herein.

123.    Jen is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.    Twitter has breached the Merger Agreement by refusing to pay Jen the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Jen the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.    As such, Jen is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Jen *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Jen will provide in briefing if and as necessary. Jen raises the issue here as part of **her** duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

127.     Jen restates and realleges each paragraph above as if fully stated herein.

128.     The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.     Jen accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.     Jen provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4th, 2023.

131.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Jen with the severance outlined in the Severance Policy Email, which she fully performed.

132.     Twitter has breached this agreement by refusing to pay Jen the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Jen.

133.     As such, Jen is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.     Jen restates and realleges each paragraph above as if fully stated herein.

135.     To the extent that Twitter's communications and Jen's subsequent conduct somehow did not create an enforceable contract between Jen and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.    The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.    Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.    It was reasonable for Jen to rely upon that promise.

139.    Jen did in fact rely upon that promise.

140.    Jen was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

141.    Twitter's promise to provide Jen with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Jen with such severance.

142.    As such, Jen is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

143.    Jen restates and realleges each paragraph above as if fully stated herein.

144.    On or about May 28th, 2021, Jen executed an offer letter from Twitter, which detailed the terms of Jen's employment (the "Offer Letter").

145.    The Offer Letter constitutes a binding contract between Jen and Twitter.

146.    The Offer Letter provides that Jen will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.    Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Jen was entitled to receive the benefit of when Twitter terminated Jen.

19

148.    Twitter did not provide Jen with severance in accordance with its benefit plan.

149.    As such, Twitter breached the Offer Letter, and Jen is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.    Jen restates and realleges each paragraph above as if fully stated herein.

151.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.    Jen did rely upon these representations.

156.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

20

158.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.    When it laid off Jen, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.    As a result of Respondents' fraud, Jen suffered damages.

161.    As such, Jen is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.    In addition, Jen is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Jen agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations**

165.    Jen restates and realleges each paragraph above as if fully stated herein.

166.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Jen.

169.    Instead, Twitter designated the period from November 4th, 2022 through January 4th, 2023 as a period during which Jen would remain employed but in a 'nonworking' status.

170.    However, Twitter has failed to continue to provide the laid-off employees (including Jen) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.    Twitter also provided other "annually refreshing" benefits to its employees.

173.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Jen, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.    As a result of Twitter's violation of the WARN Act, Jen is entitled to damages to be proven at hearing, including Jen's benefits for the "Non-Working Notice period window" to which Jen was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**G.  Count Seven: Employment Discrimination**

176.    Jen restates and realleges each paragraph above as if fully stated herein.

177.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

178.     For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

179.     In addition, the Colorado Anti-Discrimination Act prohibits employment discrimination at the state level.

180.     Despite those laws, the anecdotal evidence currently available to Jen indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

181.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

182.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

183.     Compounding these warning signs, Twitter has refused to respond to Jen's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Jen to confirm or rebut the picture painted by the available anecdotal information.

184.     Jen is a woman.

185.     On information and belief, Jen was included in the mass layoff because she is a woman.

186.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

187.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Jen is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**H. Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft**

188.    Jen restates and realleges each paragraph above as if fully stated herein.

189.    Under California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

190.    Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

191.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

192.    Under California law, the definition of "employer" against whom Jen may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

193.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Jen's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**I. Count Nine (Against Musk): Piercing the Corporate Veil**

194.    Jen restates and realleges each paragraph above as if fully stated herein.

195.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

196.    Musk, through X Holdings I, owns more than 50% of Twitter.

197.    Musk dominates Twitter's decision-making and operations.

198.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

199.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

200.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

201.    At Musk's direction, Twitter restored Anglin's account.

202.    Twitter has engaged in other content moderation decisions at Musk's whims.

203.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

204.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

205.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

206.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

207.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

208.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

209.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

25

210.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

211.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

212.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

213.    As such, Jen is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI.    REQUEST FOR RELIEF

214.    Wherefore, Jennifer Ryan respectfully requests that the Arbitrator:

    a.    Award Jen compensatory damages in an amount to be proven at hearing;

    b.    Award Jen penalty damages under the WARN Act and state and federal antidiscrimination laws;

    c.    Award Jen waiting time penalties under the California Labor Code;

    d.    Award Jen punitive damages in the amount of $500,000,000.00;

    e.    Award Jen costs and attorneys' fees as allowed by statute;

    f.    Award Jen pre- and post-judgment interest; and

    g.    Award Jen such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

*/s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

## DISPUTE RESOLUTION AGREEMENT

This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.

You can choose to opt out of this Agreement – you have 30 days to opt out.

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.





## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED         Jennifer Ryan

EMPLOYEE SIGNATURE            *Jennifer Ryan*
                             Jennifer Ryan (May 28, 2021 12:38 MDT)

Date:                        May 28, 2021





EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

 1-800-352-JAMS
www.jamsadr.com

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness. JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.*

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Twitter, Inc. |
| **ADDRESS** | 1355 Market St #900 |

| **CITY** | San Francisco | **STATE** | CA | **ZIP** | 94103 |
|---|---|---|---|---|---|

| **PHONE** | (415) 222-9670 | **FAX** | | **EMAIL** | |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Brian D. Berry |
| **FIRM/COMPANY** | Morgan, Lewis & Bockius LLP |
| **ADDRESS** | One Market, Spear Street Tower |

| **CITY** | San Francisco | **STATE** | CA | **ZIP** | 94105 |
|---|---|---|---|---|---|

| **PHONE** | (415) 442-1000 | **FAX** | (415) 442-1001 | **EMAIL** | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Jaime Sena |
| **ADDRESS** | ████████████████████ |

| **CITY** | Portland | **STATE** | OR | **ZIP** | ████ |
|---|---|---|---|---|---|

| **PHONE** | | **FAX** | | **EMAIL** | |
|---|---|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Akiva M. Cohen |
| **FIRM/COMPANY** | Kamerman, Uncyk, Soniker & Klein, P.C. |
| **ADDRESS** | 1700 Broadway, 16th Floor |

| **CITY** | New York | **STATE** | NY | **ZIP** | 10019 |
|---|---|---|---|---|---|

| **PHONE** | (212) 400-4930 | **FAX** | (866) 221-6122 | **EMAIL** | acohen@kusklaw.com |
|---|---|---|---|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach two copies of entire agreement.**

### ARBITRATION PROVISION LOCATION

Sena Jaime DRA.pdf (attached)

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.**

## REQUEST FOR HEARING

| REQUESTED LOCATION | Per Attached DRA, within 45 miles of ██████████ Portland OR ████ |

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | ███████████ |

| NAME (PRINT/TYPED) | ██████ Cohen |

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000   ☐ $100,000 to $250,000   ☐ More than $250,000   ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

 # Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | |
|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | |
| CITY | Wilmington | STATE DE | ZIP 19801 |
| PHONE | FAX | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | |
|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | |
| CITY | San Francisco | STATE CA | ZIP 94103 |
| PHONE | FAX | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

 # Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **JAIME SENA,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Jaime Sena ("Jaime") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.  This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.  Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.  Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.   The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.   As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.   Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Jaime relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.   On Jan. 4, 2023, after the close of the merger, Jaime was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Jaime signed. A copy of Jaime's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Jaime and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Jaime's employment with Twitter.

## III.   PARTIES

15.  Claimant Jaime Sena is a former Twitter employee residing in Oregon. While employed at Twitter, Jaime worked from her home in Oregon, reporting to a manager based in Twitter's New York office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.      FACTUAL BACKGROUND

### A.  Jaime Was A Dedicated Twitter Employee

21. Jaime is a was employed by Twitter as a Staff Technical Program Manager.

22. Jaime accepted her position with Twitter on or about April 13, 2022, began work on or about May 16, 2022, and remained continuously employed by Twitter until she was laid off on January 4, 2023.

23. Twitter made several promises to Jaime during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that, Jaime would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

### C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

8

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Jaime in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

10

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

    o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Jaime did, in fact, rely upon these representations.

82. The promised severance in fact factored into Jaime's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Jaime was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Jaime would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Jaime chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Jamie, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

14

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113.     After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.     Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.     The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.     All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.     The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.     Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.     On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

16

120.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.    For that reason, Jaime – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.    Jaime restates and realleges each paragraph above as if fully stated herein.

123.    Jaime is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.    Twitter has breached the Merger Agreement by refusing to pay Jaime the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Jaime the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.    As such, Jaime is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Jaime *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Jaime will provide in briefing if and as necessary. Jaime raises the issue here as part of her duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

127.    Jaime restates and realleges each paragraph above as if fully stated herein.

128.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.    Jaime accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.    Jaime provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on January 4, 2023.

131.    As such, Twitter entered into a binding agreement to provide Jaime with the severance outlined in the Severance Policy Email, which she fully performed.

132.    Twitter has breached this agreement by refusing to pay Jaime the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Jaime.

133.    As such, Jaime is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.    Jaime restates and realleges each paragraph above as if fully stated herein.

135.    To the extent that Twitter's communications and Jaime's subsequent conduct somehow did not create an enforceable contract between Jaime and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.     It was reasonable for Jaime to rely upon that promise.

139.     Jaime did in fact rely upon that promise.

140.     Jaime was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

141.     Twitter's promise to provide Jaime with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Jaime with such severance.

142.     As such, Jaime is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### D.  Count Four (against Twitter): Breach of Offer Letter

143.     Jaime restates and realleges each paragraph above as if fully stated herein.

144.     On or about [date], Jaime executed an offer letter from Twitter, which detailed the terms of Jaime's employment (the "Offer Letter").

145.     The Offer Letter constitutes a binding contract between Jaime and Twitter.

146.     The Offer Letter provides that Jaime will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Jaime was entitled to receive the benefit of when Twitter terminated Jaime.

19

148.    Twitter did not provide Jaime with severance in accordance with its benefit plan.

149.    As such, Twitter breached the Offer Letter, and Jaime is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.    Jaime restates and realleges each paragraph above as if fully stated herein.

151.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.    Jaime did rely upon these representations.

156.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

20

158.     On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.     When it laid off Jaime, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.     As a result of Respondents' fraud, Jaime suffered damages.

161.     As such, Jaime is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.     In addition, Jaime is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.     On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.     In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Jaime agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations**

165.     Jaime restates and realleges each paragraph above as if fully stated herein.

166.     The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Jaime.

169.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Jaime would remain employed but in a 'nonworking' status.

170.    However, Twitter has failed to continue to provide the laid-off employees (including Jaime) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.    Twitter also provided other "annually refreshing" benefits to its employees.

173.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Jaime, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.    As a result of Twitter's violation of the WARN Act, Jaime is entitled to damages to be proven at hearing, including Jaime's benefits for the "Non-Working Notice period window" to which Jaime was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**G.  Count Seven: New Yorn WARN Act Violations.**

176.    Jaime is a remote worker, and thus, for State and Federal WARN Act purposes, her single site of employment is the New York Twitter office in which her manager worked.

177.    The New York State WARN Act, New York Labor Law Article 25-A et seq ("New York WARN Act") required Twitter to provide Jaime with 90 days' notice before it could terminate her, not merely 60 days' notice.

178.    Despite that, Twitter terminated Jaime on only 60 days' notice.

179.    As a result of Twitter's violation of the New York WARN Act, Jaime is entitled to damages to be proven at hearing, including Jaime's salary and benefits for the extra 30 days' notice to which she was entitled, the value of any RSUs which would have vested in that 30-day period, the value of any RSU vests which would have been included in Jaime's severance had she remained employed for that additional 30-day period, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute

### H.  Count Eight: Age Discrimination

180.    Jaime restates and realleges each paragraph above as if fully stated herein.

181.    At the time she was laid off, Jaime was over 40 years of age.

182.    At the time she was laid off, Jaime's performance was rated on- or ahead-of-track.

183.    On information and belief, Jaime's age was a factor in Twitter's decision to lay her off.

184.    Twitter has thus unlawfully discriminated against Jaime on the basis of age, and as such she is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### I.  Count Nine: Employment Discrimination

185.    Jaime restates and realleges each paragraph above as if fully stated herein.

186.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

187.     For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

188.     In addition, O.R.S. § 659A.030 prohibits employment discrimination at the state level.

189.     Despite those laws, the anecdotal evidence currently available to Jaime indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

190.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

191.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

192.     Compounding these warning signs, Twitter has refused to respond to Jaime's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Jaime to confirm or rebut the picture painted by the available anecdotal information.

193.     Jaime is a Latinx woman.

194.     On information and belief, Jaime was included in the mass layoff because she is a Latinx woman.

195.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

196.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Jaime is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**J.    Count Ten: Violations of the Americans with Disabilities Act**

197.    Jaime restates and realleges each paragraph above as if fully stated herein.

198.    Jaime has ADHD and PTSD.

199.    At the time she was laid off, Jaime's performance was rated on or ahead of track.

200.    On information and belief, Jaime's disability was a factor in Twitter's decision to lay her off.

201.    Twitter has thus violated Jaime's rights under the ADA and related state laws, and as such she is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**K.    Count Eleven (Against Twitter, X Holdings I, and Musk): Wage Theft**

202.    Jaime restates and realleges each paragraph above as if fully stated herein.

203.    Under California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

204.    Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

205.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

206.    Under California law, the definition of "employer" against whom Jaime may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

207.    In addition, under Oregon law, Twitter's willful failure to pay Jaime her severance triggers waiting time penalties of 8 hours per day for 30 days, at an hourly rate determined by

dividing Jamie's pay for her last 30 days of employment by the number of hours she worked for Twitter during that period.

208.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Jaime's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**L.  Count Twelve (Against Musk): Piercing the Corporate Veil**

209.     Jaime restates and realleges each paragraph above as if fully stated herein.

210.     There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

211.     Musk, through X Holdings I, owns more than 50% of Twitter.

212.     Musk dominates Twitter's decision-making and operations.

213.     For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

214.     Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

215.     Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

216.     At Musk's direction, Twitter restored Anglin's account.

217.     Twitter has engaged in other content moderation decisions at Musk's whims.

218.     For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

219.     After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

220.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

221.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

222.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

223.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

224.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

225.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

226.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

227.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

228.    As such, Jaime is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

## VI.    REQUEST FOR RELIEF

229.    Wherefore, Jaime Sena respectfully requests that the Arbitrator:

        a.    Award Jaime compensatory damages in an amount to be proven at hearing;

b.    Award Jaime penalty damages under the WARN Act, New York WARN Act, and state and federal antidiscrimination laws;

c.    Award Jaime liquidated damages under the California Wage and Hour Act and Oregon law;

d.    Award Jaime waiting time penalties under the California Labor Code and Oregon law;

e.    Award Jaime punitive damages in the amount of $500,000,000.00;

f.    Award Jaime costs and attorneys' fees as allowed by statute;

g.    Award Jaime pre- and post-judgment interest; and

h.    Award Jaime such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,


  _/s/ Akiva M. Cohen_____
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

> **This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**
>
> **You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before, and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

### 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

### 4. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first-class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department,Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

### 5. How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

### 6. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator'sand arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and anydisputes in that regard will be resolved by the Arbitrator.

## 7. The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8. An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9. Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10. Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Dalana Brand, Chief People and Diversity Officer
Twitter, Inc.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME

PRINTED    Jaime Sena

EMPLOYEE SIGNATURE

DATE    Apr 13, 2022

EXHIBIT M

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS



## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 **1-800-352-JAMS**
🖥 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| RESPONDENT NAME | Twitter, Inc. | | |
|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | |
| CITY | San Francisco | STATE CA | ZIP 94103 |
| PHONE | (415) 222-9670 FAX | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE | (415) 442-1000 FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

## FROM CLAIMANT

Add more claimants on **page 7**.

| CLAIMANT NAME | Jim Shobe | | |
|---|---|---|---|
| ADDRESS | ██████████████ | | |
| CITY | Seattle | STATE WA | ZIP ████ |
| PHONE | FAX | EMAIL | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen | | |
|---|---|---|---|
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. | | |
| ADDRESS | 1700 Broadway, 16th Floor | | |
| CITY | New York | STATE NY | ZIP 10019 |
| PHONE | (212) 400-4930 FAX (866) 221-6122 | EMAIL acohen@kusklaw.com | |



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐  If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS)

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.**

ARBITRATION PROVISION LOCATION

Shobe Jr. James DRA JAMS.pdf (Attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION    Per Attached DRA, within 45 miles of 1501 4th Ave Seattle WA 98101

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

See: **Comprehensive Rule 16.1**

☐   By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.   The contract is with a consumer party, as defined in these standards;
2.   The contract was drafted by or on behalf of the non-consumer party; and
3.   The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.   An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.   An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.   An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.   An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000      ☐ $100,000 to $250,000      ☐ More than $250,000      ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | |
|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | |
| CITY | Wilmington | STATE | DE | ZIP 19801 |
| PHONE | | FAX | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | |
|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | |
| ADDRESS | One Market, Spear Street Tower | | | |
| CITY | San Francisco | STATE | CA | ZIP 94105 |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | |
|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | |
| CITY | San Francisco | STATE | CA | ZIP 94103 |
| PHONE | | FAX | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | |
|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | |
| ADDRESS | One Market, Spear Street Tower | | | |
| CITY | San Francisco | STATE | CA | ZIP 94105 |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

 # Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| JIM SHOBE, | |
| CLAIMANT, | |
| V. | JAMS |
| TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK, | |
| RESPONDENTS. | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Jim Shobe ("Jim") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.   INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.    That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was **not** what would happen to them if Twitter carried out a layoff after the merger closed.

9.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Jim relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12.   On Jan. 4, 2023, after the close of the merger, Jim was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Jim signed. A copy of Jim's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Jim and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Jim's employment with Twitter.

## III.    PARTIES

15.  Claimant Jim Shobe is a former Twitter employee residing in Washington. While employed at Twitter, Jim worked remotely from his home in Seattle, receiving assignments from and reporting to a supervisor at Twitter's San Francisco, California office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

4

20.  On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.     FACTUAL BACKGROUND

### A.  Jim Was A Dedicated Twitter Employee

21.  Jim is a software engineer, and was employed by Twitter as a software engineering manager.

22.  Jim accepted his position with Twitter on or about July 14, 2021, began work on or about August 30, 2021, and remained continuously employed by Twitter until he was laid off on Jan. 4, 2023.

23.  Twitter made several promises to Jim during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24.  Other promises were made more recently, including promises that, Jim would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

25.  These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26.  Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

5

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

### C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

8

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Jim in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

10

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

  o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

  o Pro-rated Performance Bonus Plan compensation at target

  o Cash value of equity that would have vested within three months from the separation date

  o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Jim did, in fact, rely upon these representations.

82. The promised severance in fact factored into Jim's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Jim was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, as well as the explicit commitment that other benefits, such as Carrot, would not be altered, Jim would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Jim chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Jim, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

15

113.     After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.     Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.     The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.     All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.     The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.     Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.     The failure to pay the severance explicitly promised in the severance agreement is not the only promise that Twitter made to Jim that Twitter and Musk have broken. Twitter provides Tweeps with reimbursement for fertility and other family-forming services (the "Carrot Services")

through a provider called. Carrot Services are provided free of charge to all Tweeps who elect to sign up for them.

120.     Tweeps who elect to use Carrot Services receive a payment card (the "Carrot Card") to pay for covered family formation expenses such as in-vitro fertilization, egg freezing, adoption, and doula services. Tweeps are reimbursed for up to $40,000 in Carrot Services every year, up to an $80,000 lifetime maximum. Reimbursements provided through Carrot are treated, and taxed, as additional income.

121.     After the merger agreement closed, Tweeps who used Carrot to pay for family formation services had their Carrot Cards declined when they attempted to pay. Tweeps who reached out to Carrot for an explanation were told that Twitter's required funding payments had not arrived, and that Carrot was unable, in turn, to pay for the Carrot Services.

122.     Many of the services Carrot covers are expensive and time-sensitive. Tweeps in the middle of fertility treatments scrambled to find funds to pay for thousands (or tens of thousands) of dollars' worth of Carrot Services to complete treatment cycles that they had begun in reliance on the Carrot Benefit's promised availability.

123.     On December 29, 2022, Tweeps who used the Carrot Services received an email from Carrot (the "Carrot Reduction Email"). This email read in relevant part:

> Starting January 1, 2023, Twitter's lifetime maximum for fertility health and family forming journeys will reduce to $40,000 (or equivalent in local currency).

This change reduced the Carrot Benefit to 50% of its former value. Tweeps who had planned their Carrot Services usage in reliance on the program's promised availability to maximize their value found themselves facing the exhaustion not merely of their annual maximum, but of the lifetime maximum – only two days to go before they had reasonably expected those benefits to refresh on January 1, 2023.

124.    Jim used Carrot Services, and reached the $40,000 annual maximum in 2022.

125.    Jim planned to use Carrot Services in 2023, and in fact submitted an invoice for an additional $40,000 in reimbursement on January 3, 2023.

126.    Payment of this invoice was denied by Twitter based on Twitter's unilateral decision to slash the lifetime maximum, which had been made five days earlier.

127.    Not only did this sudden change in benefit levels severely disrupt the family-forming plans of many Tweeps – including Jim – it also represents a significant reduction in continuing employee benefits, which Section 6.9(a) of the Merger Agreement represented would remain "substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time."

128.    On information and belief, no new benefits are being provided which would offset the reduction caused by the alteration in the Carrot Services.

129.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

130.    In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

131.    For that reason, Jim – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

18

## V. CAUSES OF ACTION

### A. Count One (against Twitter and X Holdings I): Breach of Merger Agreement

132.    Jim restates and realleges each paragraph above as if fully stated herein.

133.    Jim is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

134.    Twitter has breached the Merger Agreement by refusing to pay Jim the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

135.    X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Jim the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

136.    As such, Jim is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B. Count Two: (against Twitter) Breach of Oral Contract

137.    Jim restates and realleges each paragraph above as if fully stated herein.

138.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

139.    Jim accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Jim *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Jim will provide in briefing if and as necessary. Jim raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

140.     Jim provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on Jan. 4, 2023.

141.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Jim with the severance outlined in the Severance Policy Email, which he fully performed.

142.     Twitter has breached this agreement by refusing to pay Jim the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Jim.

143.     As such, Jim is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## C.  Count Three (in the alternative, against Twitter): Promissory Estoppel

144.     Jim restates and realleges each paragraph above as if fully stated herein.

145.     To the extent that Twitter's communications and Jim's subsequent conduct somehow did not create an enforceable contract between Jim and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

146.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

147.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

148.     It was reasonable for Jim to rely upon that promise.

149.     Jim did in fact rely upon that promise.

150.     Jim was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

151.     Twitter's promise to provide Jim with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Jim with such severance.

152.     As such, Jim is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### D.  Count Four (against Twitter): Breach of Offer Letter

153.     Jim restates and realleges each paragraph above as if fully stated herein.

154.     On or about July 14, 2021, Jim executed an offer letter from Twitter, which detailed the terms of Jim's employment (the "Offer Letter").

155.     The Offer Letter constitutes a binding contract between Jim and Twitter.

156.     The Offer Letter provides that Jim will be eligible to receive benefits under the terms of Twitter's benefits plans.

157.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Jim was entitled to receive the benefit of when Twitter terminated Jim.

158.     Twitter did not provide Jim with severance in accordance with its benefit plan.

159.     As such, Twitter breached the Offer Letter, and Jim is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### E.  Count Five (against all Respondents): Fraud

160.     Jim restates and realleges each paragraph above as if fully stated herein.

161.     In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

21

162.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

163.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

164.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

165.    Jim did rely upon these representations.

166.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

167.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

168.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

169.    When it laid off Jim, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

170.    As a result of Respondents' fraud, Jim suffered damages.

171.    As such, Jim is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

172.     In addition, Jim is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

173.     On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

174.     In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Jim agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.   Count Six: WARN Act Violations**

175.     Jim restates and realleges each paragraph above as if fully stated herein.

176.     The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

177.     On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

178.     In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Jim.

179.     Instead, Twitter designated the period from Nov. 4, 2022 through Jan. 4, 2023 as a period during which Jim would remain employed but in a 'nonworking' status.

180.     However, Twitter has failed to continue to provide the laid-off employees (including Jim) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

181.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

182.    Twitter also provided other "annually refreshing" benefits to its employees.

183.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Jim, despite those employees continuing to be employed by Twitter on January 1, 2023.

184.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

185.    As a result of Twitter's violation of the WARN Act, Jim is entitled to damages to be proven at hearing, including Jim's benefits for the "Non-Working Notice period window" to which Jim was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Employment Discrimination

186.    Jim restates and realleges each paragraph above as if fully stated herein.

187.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

188.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

189.    In addition, in Washington, RCW 49.60.030 and 49.60.180(2) bar discrimination in employment.

190.    Despite those laws, the anecdotal evidence currently available to Jim indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

24

191.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

192.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

193.    Compounding these warning signs, Twitter has refused to respond to Jim's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Jim to confirm or rebut the picture painted by the available anecdotal information.

194.    Jim is a gay man.

195.    On information and belief, Jim was included in the mass layoff because he is a gay man.

196.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

197.    As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Jim is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

### H.  Count Eight: FMLA/CFRA Retaliation (29 U.S.C.A. § 2615(a)(2), Cal. Code Regs. tit. 2, § 11094(b)) (WA: RCW 50A.40.010(1)(b))

198.    Jim restates and realleges each paragraph above as if fully stated herein.

199.    Jim took medical leave to which he was entitled from June 22, 2022 through Sep. 3, 2022.

200.     Jim was informed he was being laid off shortly after his return from medical leave.

201.    On information and belief, Jim's use of the medical leave to which he was entitled was a factor in Twitter's decision to lay him off.

202.     Twitter has thus retaliated against Jim for his use of the medical leave to which he was entitled.

203.     As such, Jim is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**I.   Count Nine (Against Twitter, X Holdings I, and Musk): Wage Theft**

204.     Jim restates and realleges each paragraph above as if fully stated herein.

205.     Under both California and Washington law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

206.     Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

207.     Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

208.     Under California law, the definition of "employer" against whom Jim may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

209.     Twitter's choice to pay Jim less than the severance guaranteed to him under the Severance Stability Promise was made willfully, with the intent to deprive him of his rightful wages, in violation of RCW 49.52.050(2).

210.     Jim is therefore entitled to an award for damages, including compensatory damages under RCW 49.48.010 and double exemplary damages under RCW 49.52.070.

211.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Jim's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**J.    Count Ten (Against Musk): Piercing the Corporate Veil**

212.    Jim restates and realleges each paragraph above as if fully stated herein.

213.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

214.    Musk, through X Holdings I, owns more than 50% of Twitter.

215.    Musk dominates Twitter's decision-making and operations.

216.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

217.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

218.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

219.    At Musk's direction, Twitter restored Anglin's account.

220.    Twitter has engaged in other content moderation decisions at Musk's whims.

221.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

222.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

223.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

224.     On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

225.     On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

226.     On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

227.     Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

228.     On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

229.     On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

230.     Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

231.     As such**,** Jim is entitled to an award holding Musk personally liable for any amounts awarded on his other claims.

**VI.     REQUEST FOR RELIEF**

232.     Wherefore, Jim Shobe respectfully requests that the Arbitrator:

     a.   Award Jim compensatory damages in an amount to be proven at hearing;

     b.   Award Jim penalty damages under the WARN Act and state and federal antidiscrimination laws;

c.   Award Jim liquidated damages under California's Wage and Hour Act and
     Washington's minimum wage law;

d.   Award Jim waiting time penalties under the California Labor Code;

e.   Award Jim punitive damages in the amount of $500,000,000.00;

f.   Award Jim costs and attorneys' fees as allowed by statute;

g.   Award Jim pre- and post-judgment interest; and

h.   Award Jim such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

                         _/s/ Akiva M. Cohen_____
                         Akiva M. Cohen

                         KAMERMAN, UNCYK, SONIKER &
                         KLEIN, P.C.
                         1700 Broadway
                         New York, New York 10019
                         (212) 400-4930
                         acohen@kusklaw.com
                         Dylan M. Schmeyer
                         dmschmeyer@kusklaw.com
                         Michael D. Dunford
                         mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

rev.NOV2018



JS

1

## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED    Jim Shobe

EMPLOYEE SIGNATURE    *Jim Shobe*
Jim Shobe (Jul 14, 2021 13:55 PDT)

Date:    Jul 14, 2021



EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.



📞 **1-800-352-JAMS**

🖥 **www.jamsadr.com**

---

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| RESPONDENT NAME | Twitter, Inc. | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94103 |
| PHONE | (415) 222-9670 | FAX | | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | | |
| ADDRESS | One Market, Spear Street Tower | | | | |
| CITY | San Francisco | STATE | CA | ZIP | 94105 |
| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7.**

| CLAIMANT NAME | Karyn Thomas | | | | |
|---|---|---|---|---|---|
| ADDRESS | ███████████ | | | | |
| CITY | Beaverton | STATE | OR | ZIP | ███ |
| PHONE | | FAX | | EMAIL | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen | | | | |
|---|---|---|---|---|---|
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. | | | | |
| ADDRESS | 1700 Broadway, 16th Floor | | | | |
| CITY | New York | STATE | NY | ZIP | 10019 |
| PHONE | (212) 400-4930 | FAX | (866) 221-6122 | EMAIL | acohen@kusklaw.com |



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐    If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# JAMS Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach* <u>*two copies*</u> *of entire agreement.*

**ARBITRATION PROVISION LOCATION**

Thompson Karyn DRA.pdf

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with* <u>*two copies*</u> *to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   Per Attached DRA, within 45 miles of ███████████ Beaverton, OR ███

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See:* **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | February 24, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators*, *Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | X Holdings I, Inc. |
| ADDRESS | 1209 ORANGE ST |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | Wilmington | | DE | | 19801 |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | | | | | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | San Francisco | | CA | | 94105 |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | (415) 442-1000 | | (415) 442-1001 | | brian.berry@morganlewis.com |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | Elon Musk |
| ADDRESS | 1355 Market St #900 |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | San Francisco | | CA | | 94103 |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | | | | | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | One Market, Spear Street Tower |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|
| | San Francisco | | CA | | 94105 |

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|
| | (415) 442-1000 | | (415) 442-1001 | | brian.berry@morganlewis.com |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CAUSE NO. _____

| | |
|---|---|
| **KARYN THOMPSON,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

### CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Karyn Thompson ("Karyn") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

## I. INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4. The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5. On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6. As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7. Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8. That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

2

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was *not* what would happen to them if Twitter carried out a layoff after the merger closed.

9.     Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Karyn relied on Twitter's representation that she would have a safety net if she was terminated after the merger as part of her decision to remain at Twitter.

12.   On January 4, 2023, after the close of the merger, Karyn was laid off by Twitter. Yet Twitter has refused to provide her with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Karyn signed. A copy of Karyn's executed DRA is submitted herewith, and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Karyn and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Karyn's employment with Twitter.

## III.    PARTIES

15.  Claimant Karyn Thompson is a former Twitter employee residing in Oregon. While employed at Twitter, Karyn worked from her home in Oregon, reporting to Twitter's San Francisco office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20.  On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis &

Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.    FACTUAL BACKGROUND

### A.  Karyn Was A Dedicated Twitter Employee

21.  Karyn was employed by Twitter as a Senior Strategy and Operations Analyst.

22.  Karyn accepted her position with Twitter on or about Nov. 5, 2020, began work on or about 12/7/2020, and remained continuously employed by Twitter until she was laid off on Jan. 4, 2023.

23.  Twitter made several promises to Karyn during the course of her employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24.  Other promises were made more recently, including promises that, Karyn would maintain at least the same base salary and wage rate, that her employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide her with a severance package that was at least as favorable as those it had long offered.

25.  These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.  Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26.  Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

27.  Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

**C.  Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

8

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Karyn in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

  o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

  o Pro-rated Performance Bonus Plan compensation at target

  o Cash value of equity that would have vested within three months from the separation date

  o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Karyn did, in fact, rely upon these representations.

82. The promised severance in fact factored into Karyn's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Karyn was aware that she had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, she would receive a significant sum as a severance payment, which would help provide her time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Karyn would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Karyn chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98. The next day, roughly half of Twitter's workforce, including Karyn, were laid off.

99. The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100. Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101. But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102. These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103. In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104. He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105. Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.     Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.     As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.     But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.     As part of this wave of layoffs, a substantial number of employeeswere laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.     And yet again, that still wasn't enough.

111.     After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.     The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

15

113.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.     In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.     For that reason, Karyn – along with hundreds (hopefully thousands) of her former colleagues filing similar claims – brings this arbitration to vindicate her rights and recover the amounts Twitter owes her, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.     Karyn restates and realleges each paragraph above as if fully stated herein.

123.     Karyn is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.     Twitter has breached the Merger Agreement by refusing to pay Karyn the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.     X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Karyn the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

126.     As such, Karyn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Karyn *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Karyn will provide in briefing if and as necessary. Karyn raises the issue here as part of her duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

127.    Karyn restates and realleges each paragraph above as if fully stated herein.

128.    The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.    Karyn accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.    Karyn provided Twitter with consideration for its promise by continuing to work at Twitter through that period until she was laid off on Jan 4, 2023.

131.    As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Karyn with the severance outlined in the Severance Policy Email, which she fully performed.

132.    Twitter has breached this agreement by refusing to pay Karyn the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Karyn.

133.    As such, Karyn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.    Karyn restates and realleges each paragraph above as if fully stated herein.

135.    To the extent that Twitter's communications and Karyn's subsequent conduct somehow did not create an enforceable contract between Karyn and Twitter, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.     The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.     Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.     It was reasonable for Karyn to rely upon that promise.

139.     Karyn did in fact rely upon that promise.

140.     Karyn was damaged by that reasonable reliance, in that it negatively impacted her ability to find alternative employment in advance of the merger.

141.     Twitter's promise to provide Karyn with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Karyn with such severance.

142.     As such, Karyn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

143.     Karyn restates and realleges each paragraph above as if fully stated herein.

144.     On or about [date], Karyn executed an offer letter from Twitter, which detailed the terms of Karyn's employment (the "Offer Letter").

145.     The Offer Letter constitutes a binding contract between Karyn and Twitter.

146.     The Offer Letter provides that Karyn will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Karyn was entitled to receive the benefit of when Twitter terminated Karyn.

148.    Twitter did not provide Karyn with severance in accordance with its benefit plan.

149.    As such, Twitter breached the Offer Letter, and Karyn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.    Karyn restates and realleges each paragraph above as if fully stated herein.

151.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.    Karyn did rely upon these representations.

156.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.    When it laid off Karyn, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.    As a result of Respondents' fraud, Karyn suffered damages.

161.    As such, Karyn is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.    In addition, Karyn is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Karyn agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.  Count Six: WARN Act Violations**

165.    Karyn restates and realleges each paragraph above as if fully stated herein.

166.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Karyn.

169.    Instead, Twitter designated the period from Nov 4, 2022 through Jan. 4, 2023 as a period during which Karyn would remain employed but in a 'nonworking' status.

170.    However, Twitter has failed to continue to provide the laid-off employees (including Karyn) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.    Twitter also provided other "annually refreshing" benefits to its employees.

173.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Karyn, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.    As a result of Twitter's violation of the WARN Act, Karyn is entitled to damages to be proven at hearing, including Karyn's benefits for the "Non-Working Notice period window" to which Karyn was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: Employment Discrimination

176.    Karyn restates and realleges each paragraph above as if fully stated herein.

177.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

178.     For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

179.     In addition, in Oregon, O.R.S. § 659A.030 also bars discrimination in employment.

180.     Despite those laws, the anecdotal evidence currently available to Karyn indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

181.     Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

182.     Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

183.     Compounding these warning signs, Twitter has refused to respond to Karyn's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Karyn to confirm or rebut the picture painted by the available anecdotal information.

184.     Karyn is a woman.

185.     On information and belief, Karyn was included in the mass layoff because she is a woman.

186.     The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

187.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Karyn is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

**H.  Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft**

188.     Karyn restates and realleges each paragraph above as if fully stated herein.

189.     Under both Oregon and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

190.     Under California and law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

191.     Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

192.     Under California law, the definition of "employer" against whom Karyn may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

193.     In addition, under Oregon law, Twitter's willful failure to pay Karyn her severance triggers waiting time penalties of 8 hours per day for 30 days, at an hourly rate determined by dividing Karyn's pay for her last 30 days of employment by the number of hours she worked for Twitter during that period.

194.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Karyn's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

I.   **Count Nine: Age Discrimination (29 U.S.C. § 621 *et seq.* & Cal. Gov't Code § 12941)**

195.     Karyn restates and realleges each paragraph above as if fully stated herein.

196.     At the time she was laid off, Karyn was over 40 years of age.

197.     At the time she was laid off, Karyn's performance was related on- or ahead-of-track.

198.     On information and belief, Karyn's age was a factor in Twitter's decision to lay her off.

24

199.   Twitter has thus unlawfully discriminated against Karyn on the basis of age, and as such is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### J.   Count Ten (Against Musk): Piercing the Corporate Veil

200.   Karyn restates and realleges each paragraph above as if fully stated herein.

201.   There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

202.   Musk, through X Holdings I, owns more than 50% of Twitter.

203.   Musk dominates Twitter's decision-making and operations.

204.   For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

205.   Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

206.   Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

207.   At Musk's direction, Twitter restored Anglin's account.

208.   Twitter has engaged in other content moderation decisions at Musk's whims.

209.   For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

210.   After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

211.   Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

212.     On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

213.     On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

214.     On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

215.     Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

216.     On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

217.     On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

218.     Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

219.     As such, Karyn is entitled to an award holding Musk personally liable for any amounts awarded on her other claims.

**VI.     REQUEST FOR RELIEF**

220.     Wherefore, Karyn Thompson respectfully requests that the Arbitrator:

      a.   Award Karyn compensatory damages in an amount to be proven at hearing;

      b.   Award Karyn penalty damages under the WARN Act and California, Oregon and federal antidiscrimination laws;

    c.   Award Karyn liquidated damages under California and Oregon's Wage and Hour Acts;

    d.   Award Karyn waiting time penalties under the California Labor Code;

    e.   Award Karyn punitive damages in the amount of $500,000,000.00;

    f.   Award Karyn costs and attorneys' fees as allowed by statute;

    g.   Award Karyn pre- and post-judgment interest; and

    h.   Award Karyn such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,


                          */s/ Akiva M. Cohen*
                          Akiva M. Cohen

                          KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
                          1700 Broadway
                          New York, New York 10019
                          (212) 400-4930
                          acohen@kusklaw.com
                          Dylan M. Schmeyer
                          dmschmeyer@kusklaw.com
                          Michael D. Dunford
                          mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1.  How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2.  Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.





## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.





## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED        Karyn A Thompson

EMPLOYEE SIGNATURE        *Karyn A Thompson*
Karyn A Thompson (Nov 5, 2020 13:45 PST)

Date:        Nov 5, 2020



EXHIBIT

# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS



## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

**1-800-352-JAMS**
**www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A.** **Demand for Arbitration** *(2 copies)*

**B.** **Proof of service of the Demand on the appropriate party** *(2 copies)*

**C.** **Entire contract containing the arbitration clause** *(2 copies)*
  - *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D.** **Administrative Fees**
  - *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

  - *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| RESPONDENT NAME | Twitter, Inc. | | |
|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | |
| CITY | San Francisco | STATE CA | ZIP 94103 |
| PHONE | (415) 222-9670 | FAX | EMAIL |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

## FROM CLAIMANT

Add more claimants on **page 7**.

| CLAIMANT NAME | Cristian Zapata | | |
|---|---|---|---|
| ADDRESS | ▮▮▮▮▮▮▮▮▮▮ | | |
| CITY | Lawrenceville, New Jersey ▮▮▮ | STATE NJ | ZIP ▮▮▮ |
| PHONE | FAX | EMAIL | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Akiva M. Cohen | | |
|---|---|---|---|
| FIRM/COMPANY | Kamerman, Uncyk, Soniker & Klein, P.C. | | |
| ADDRESS | 1700 Broadway, 16th Floor | | |
| CITY | New York | STATE NY | ZIP 10019 |
| PHONE (212) 400-4930 | FAX (866) 221-6122 | EMAIL acohen@kusklaw.com | |

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.**

**ARBITRATION PROVISION LOCATION**

Zapata Cristian DRA.pdf

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.**

## REQUEST FOR HEARING

**REQUESTED LOCATION**    Per Attached DRA, within 45 miles of ████████████████, Lawrenceville, New

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See:* **Comprehensive Rule 16.1**

☐  By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

**SIGNATURE**    /s/ Akiva M. Cohen        **DATE**    February 24, 2023

**NAME (PRINT/TYPED)**    Akiva M. Cohen

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000       ☐ $100,000 to $250,000       ☐ More than $250,000       ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. | | | |
|---|---|---|---|---|
| ADDRESS | 1209 ORANGE ST | | | |
| CITY | Wilmington | STATE DE | ZIP 19801 | |
| PHONE | | FAX | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | |
|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | |
| ADDRESS | One Market, Spear Street Tower | | | |
| CITY | San Francisco | STATE CA | ZIP 94105 | |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | | |
|---|---|---|---|---|
| ADDRESS | 1355 Market St #900 | | | |
| CITY | San Francisco | STATE CA | ZIP 94103 | |
| PHONE | | FAX | EMAIL | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | | |
|---|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | | |
| ADDRESS | One Market, Spear Street Tower | | | |
| CITY | San Francisco | STATE CA | ZIP 94105 | |
| PHONE | (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

CITY | STATE | ZIP

PHONE | FAX | EMAIL

CAUSE NO. _____

| | |
|---|---|
| **CRISTIAN ZAPATA,** | |
| **CLAIMANT,** | |
| **V.** | **JAMS** |
| **TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,** | |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Cristian Zapata ("Cristian") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Holdings I, Inc. ("X Holdings I"), and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.  INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

4.    The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

5.    On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022, Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

6.    As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

7.    Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.    That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited:

"Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was ***not*** what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.   Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

11.   As detailed below, that worked; Cristian relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12.   On January 4, 2023, after the close of the merger, Cristian was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

## II.  ARBITRATION PROVISION

13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"), which Cristian signed. A copy of Cristian's executed DRA is submitted herewith and provides for arbitration with JAMS.

14.  There is no arbitration agreement between Cristian and either Musk or X Holdings I. Despite that, Musk and X Holdings I must arbitrate the claims against them because those claims are inextricably intertwined with the claims against Twitter and arise out of Cristian's employment with Twitter.

### III.     PARTIES

15.  Claimant Cristian Zapata is a former Twitter employee residing in Lawrenceville, New Jersey. While employed at Twitter, Cristian worked from his home, located at ████████████ ████, Lawrenceville, New Jersey ████. His work was assigned from the San Francisco office and he reported to a manager located at the San Francisco office.

16.  Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com
212-400-4930

17.  Respondent Twitter is a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103.

18.  Respondent X Holdings I is a Delaware corporation.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20. On information and belief, Twitter, X Holdings I, and Musk are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

## IV.   FACTUAL BACKGROUND

### A.   Cristian Was A Dedicated Twitter Employee

21. Cristian is a Software Engineer and was employed by Twitter as Sr. Software Engineer, and reported to Moushmi Verma.

22. Cristian accepted his position with Twitter on or about March 8, 2022, began work on or about May 2, 2022, and remained continuously employed by Twitter until he was laid off on January 4, 2023.

23. Twitter made several promises to Cristian during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24. Other promises were made more recently, including promises that Cristian would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B.   Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply With the Terms of the Agreement He Voluntarily Entered

26. Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

5

27. Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. The deal closed on October 27.

42. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those*

*applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. Cristian in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

  o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

  o Pro-rated Performance Bonus Plan compensation at target

  o Cash value of equity that would have vested within three months from the separation date

  o A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

11

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Cristian did, in fact, rely upon these representations.

82. The promised severance in fact factored into Cristian's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Cristian was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Cristian would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Cristian chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97.  On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98.  The next day, roughly half of Twitter's workforce, including Cristian, were laid off.

99.  The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100.  Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101.  But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102.  These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103.  In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

104.  He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105.  Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106. Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107. As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108. But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109. As part of this wave of layoffs, a substantial number of employees, were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110. And yet again, that still wasn't enough.

111. After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112. The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

119.    On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.     In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.     For that reason, Cristian – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.     Cristian restates and realleges each paragraph above as if fully stated herein.

123.     Cristian is an intended third-party beneficiary[1] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.     Twitter has breached the Merger Agreement by refusing to pay Cristian the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.     X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Cristian the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

---

[1] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Cristian *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Cristian will provide in briefing if and as necessary. Cristian raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

126.     As such, Cristian is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**B.  Count Two: (against Twitter) Breach of Oral Contract**

127.     Cristian restates and realleges each paragraph above as if fully stated herein.

128.     The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.     Cristian accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.     Cristian provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on January 4, 2022.

131.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Cristian with the severance outlined in the Severance Policy Email, which he fully performed.

132.     Twitter has breached this agreement by refusing to pay Cristian the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Cristian.

133.     As such, Cristian is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**C.  Count Three (in the alternative, against Twitter): Promissory Estoppel**

134.     Cristian restates and realleges each paragraph above as if fully stated herein.

135.     To the extent that Twitter's communications and Cristian's subsequent conduct somehow did not create an enforceable contract between Cristian and Twitter, Twitter's

representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.    The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.    Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.    It was reasonable for Cristian to rely upon that promise.

139.    Cristian did in fact rely upon that promise.

140.    Cristian was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

141.    Twitter's promise to provide Cristian with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Cristian with such severance.

142.    As such, Cristian is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### D.  Count Four (against Twitter): Breach of Offer Letter

143.    Cristian restates and realleges each paragraph above as if fully stated herein.

144.    On or about March 18, 2022, Cristian executed an offer letter from Twitter, which detailed the terms of Cristian's employment (the "Offer Letter").

145.    The Offer Letter constitutes a binding contract between Cristian and Twitter.

146.    The Offer Letter provides that Cristian will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.     Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Cristian was entitled to receive the benefit of when Twitter terminated Cristian.

148.     Twitter did not provide Cristian with severance in accordance with its benefit plan.

149.     As such, Twitter breached the Offer Letter, and Cristian is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.     Cristian restates and realleges each paragraph above as if fully stated herein.

151.     In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.     Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.     In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.     On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.     Cristian did rely upon these representations.

156.     On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.     Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that

requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.    When it laid off Cristian, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.    As a result of Respondents' fraud, Cristian suffered damages.

161.    As such, Cristian is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.    In addition, Cristian is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Cristian agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

### F.  Count Six: WARN Act Violations

165.    Cristian restates and realleges each paragraph above as if fully stated herein.

166.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167.    On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168.    In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Cristian.

169.    Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Cristian would remain employed but in a 'nonworking' status.

170.    However, Twitter has failed to continue to provide the laid-off employees (including Cristian) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171.    For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172.    Twitter also provided other "annually refreshing" benefits to its employees.

173.    Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Cristian, despite those employees continuing to be employed by Twitter on January 1, 2023.

174.    Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175.    As a result of Twitter's violation of the WARN Act, Cristian is entitled to damages to be proven at hearing, including Cristian's benefits for the "Non-Working Notice period window" to which Cristian was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

**G.  Count Seven: Employment Discrimination**

176.    Cristian restates and realleges each paragraph above as if fully stated herein.

22

177.   Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

178.   For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

179.   New Jersey law similarly bars employment discrimination.

180.   Despite those laws, the anecdotal evidence currently available to Cristian indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

181.   Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

182.   Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

183.   Compounding these warning signs, Twitter has refused to respond to Cristian's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Cristian to confirm or rebut the picture painted by the available anecdotal information.

184.   Cristian is Hispanic.

185.   Cristian is more than 40 years old.

186.   On information and belief, Cristian was included in the mass layoff because he is Hispanic and because he is more than 40 years old.

187.   The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

188.     As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Cristian is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

### H.  Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft

189.     Cristian restates and realleges each paragraph above as if fully stated herein.

190.     Under both New Jersey and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

191.     Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

192.     Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

193.     Under California law, the definition of "employer" against whom Cristian may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

194.     Moreover, under New Jersey law, Cristian is entitled to treble damages as liquidated damages for the wage theft.

195.     As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Cristian's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### I.  Count Nine (Against Musk): Piercing the Corporate Veil

196.     Cristian restates and realleges each paragraph above as if fully stated herein.

197.     There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

198.    Musk, through X Holdings I, owns more than 50% of Twitter.

199.    Musk dominates Twitter's decision-making and operations.

200.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

201.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

202.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

203.    At Musk's direction, Twitter restored Anglin's account.

204.    Twitter has engaged in other content moderation decisions at Musk's whims.

205.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

206.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

207.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

208.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

209.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

210.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

211.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

212.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

213.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

214.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

215.    As such, Cristian is entitled to an award holding Musk personally liable for any amounts awarded on his other claims.

**VI.    REQUEST FOR RELIEF**

216.    Wherefore, Cristian Zapata respectfully requests that the Arbitrator:

    a.  Award Cristian compensatory damages in an amount to be proven at hearing;

    b.  Award Cristian penalty damages under the WARN Act and federal and state antidiscrimination laws;

    c.  Award Cristian liquidated damages under New Jersey and California law;

    d.  Award Cristian waiting time penalties under the California Labor Code;

    e.  Award Cristian punitive damages in the amount of $500,000,000.00;

    f.  Award Cristian costs and attorneys' fees as allowed by statute;

    g.  Award Cristian pre- and post-judgment interest; and

   h. Award Cristian such other and further relief as the Arbitrator deems

   appropriate.

Respectfully Submitted,


         */s/ Akiva M. Cohen*
        Akiva M. Cohen

        KAMERMAN, UNCYK, SONIKER &
        KLEIN, P.C.
        1700 Broadway
        New York, New York 10019
        (212) 400-4930
        acohen@kusklaw.com
        Dylan M. Schmeyer
        dmschmeyer@kusklaw.com
        Michael D. Dunford
        mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1. How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2. Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before, and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.

### 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee. Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

### 4. Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first-class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department,Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

### 5. How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

### 6. Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator'sand arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and anydisputes in that regard will be resolved by the Arbitrator.

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Dalana Brand, Chief People and Diversity Officer
Twitter, Inc.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME

PRINTED                    Cristian Zapata

EMPLOYEE SIGNATURE         *Cristian Zapata*
                           Cristian Zapata (Mar 18, 2022 16:58 EDT)

DATE                       Mar 18, 2022